**STATE v. TEXAS MUT. LIFE INS. CO. OF TEXAS et al.***

No. 7720; Motion Nos. 7308–7311.

Court of Civil Appeals of Texas. Austin.
April 20, 1932.

Rehearing Denied May 25, 1932.

*Writ of error granted.

James V. Allred, Atty. Gen., and Everett L. Looney, Asst. Atty. Gen., for the State.

Richey & Sheehy, of Waco, and Cofer & Cofer, of Austin, for appellees.

McCLENDON, C. J.

The state through its Attorney General brought this proceeding in the nature of a quo warranto, seeking to forfeit the charter of the Texas Mutual Life Insurance Company of Texas, to which we shall refer as appellee, and for other proper ancillary relief, on the ground that the company was doing a state-wide assessment plan life insurance business in Texas, without complying with the following statutory provisions:

1. That it does not have a capital stock of at least $100,000 required by article 4717, R. S. 1925.

2. That its policies do not contain any of the following requirements prescribed by articles 4732 and 4733, R. S. 1925:

(a) At the end of three years the company will advance upon assignment and sole security of the policy, the legal reserve at the end of the current policy year.

(b) In case of default in payment of premiums after three full years, the policyholders shall be entitled to a stipulated sum of insurance.

(c) A table showing in figures the loan values and other available options in event of default in the premium payments.

(d) Loan value or a stipulated insurance upon default in payment of premiums or assessments.

The case was tried to the court upon an agreed statement of facts, and judgment was rendered for the defendant, the court adopting the agreed statement of facts as its fact findings, and concluding as a matter of law that the defendant is a benevolent association, and the insurance laws of Texas are not applicable to it.

From the agreed statement of facts it appears that the defendant was chartered on June 20, 1905; under the name "Home Mutual Life Insurance Association of Texas"; the charter reciting that the association was formed for the purpose of insuring the lives of its members in this state for the sole benefit of its members, and not for profit, and that it should have no capital stock. Its principal office was located at Eastland; but later by amendment to its charter, dated April 13, 1925, its name was changed to Texas Mutual Life Insurance Association of Texas, and its place of business changed from Eastland to Waco. From the time of its organization to the filing of this suit (March 16, 1929), it has engaged in the business of insuring the lives of its members as authorized by its charter within the confines of the state; and has paid franchise taxes from date of issuance of its charter to and including 1929, "and is now marked 'Exempt' from franchise taxes on the ledger sheet of said corporation in the Secretary of State's office." It has filed or offered to file with the board of insurance commissioners of the state all reports required to be filed of it under the law under which its charter was granted; but the board has refused to permit the association to file reports, and refused to recognize it as coming under its supervision. At the time suit was filed it was carrying on the business of writing life insurance and operating state wide in the state of Texas. It never procured from the insurance commissioner a certificate authorizing it to do business in the state as required by article 4751, but after the above amendment of its charter, it on several occasions applied to the board for a permit. The character of life insurance business carried on by it is operated upon a post mortem assessment as needed basis, and the policies require the payment as needed on the order of the directors of an assessment by the policyholder upon the death of other policyholders. All relief funds are created and sustained by assessment against its policyholders, and each policyholder is a member. The corporation has no capital stock, and its policies contain none of the above statutory provisions.

The company has now in force approximately $40,000,000 in insurance. Specimens of the policies or certificates issued by the corporation are attached to the agreed statement of facts. There are four forms of policies, differing only in the amount of the insurance, $1,100, $2,000, $2,500, and $5,000, and the assessments. We give a résumé of the $1,100 policy, the others being identical except as above stated. Membership is based on application and is subject to the by-laws of the association; the loss payable to the beneficiary or his heirs is the sum of $1 to be collected from each member of the association in good standing in the particular class at the time of beneficiary's death, plus all death assessments which have been paid by the assured during the life of the policy, such amounts in no event to exceed $1,100, plus such death assessments. The insured is liable for a death assessment of $1.20 each upon the death of each member in his particular class, and one assessment of $3 as annual dues to be paid on or before October 1st of each year. Additionally the insured agrees to pay one special assessment of $1.80 each year which shall be used for the general fund. The obligation of the association to pay the amount stipulated in the policy is conditioned upon the amount being collected from policyholders in the particular class through one assessment upon each member in good standing in that class at the date of insured's death. The policy contains a number of provisions with reference to forfeiture, etc., which we deem unnecessary to set out in detail. The by-laws are not embodied in nor attached to the agreed statement of facts, nor is their substance given; and there is no showing as to how the funds derived from the annual dues, the general fund special assessment, or the excess over the assessments collected upon the death of a member, are expended further than may be inferred from the agreed statement of facts that the corporation was organized for the benefit of its members only, and not for profit; and that it "has engaged in the business of insuring the lives of its members, as authorized by its charter, continuously since its issuance within the confines of the State of Texas." The corporation was chartered in 1905, under subdivision 46 of article 642, Revised Statutes of 1895.

It is the defendant's contention, which the trial court sustained, that at the time of its

creation it was a mutual relief association within the meaning of article 2971a, R. S. of 1879, enacted by Laws 1885, c. 65 (article 3096, R. S. 1895), and article 3096w, R. S. 1895, and is therefore exempt from the provisions of the insurance laws of Texas.

Besides contesting this view, the state contends that the subsequent repeal of the above exemption statutes ipso facto brought defendant within the purview of the general insurance laws of Texas, and its failure thereafter to comply therewith forfeited its corporate rights.

Defendant's contentions, on the other hand, are: First, that the repeal of the statutes under which it was created and exempted from the insurance laws of the state operated prospectively, and did not expressly or by necessary implication repeal its charter or the exemption privileges under which it was originally created so as to require it to conform to statutory provisions relating to insurance; and, secondly, the statutes under which it was so created and exempted are of such doubtful import as to warrant resort to uniform departmental construction for over twenty years prior to the bringing of the suit and to require the courts to recognize the validity of its charter and the applicability of said exemption statutes.

We will first consider the validity of defendant's original incorporation, and this involves primarily the question whether a corporation, the sole purpose of which is to provide insurance to its members and their dependents in the event of death, injury by accident, or illness, if it has no capital stock and its relief funds are created and sustained by assessments made upon the members in accordance with the by-laws, and which is conducted not for profit but solely for the benefit of its members, can constitute a mutual relief association within the meaning of article 2971a, R. S. 1879.

The state relies in the main upon two decisions, Farmer v. State, 69 Tex. 561, 7 S. W. 220, 224 (decided in 1888, Chief Justice Willie writing), and State v. Burgess, 101 Tex. 524, 109 S. W. 922, 923 (decided in 1908, Associate Justice Williams writing).

The Farmer Case was brought to forfeit the charter of the Masonic Mutual Benevolent Association of Texas, which was incorporated without capital stock under the then title 20 (present title 32, being the general incorporation title) of the Revised Statutes. That association was chartered September 3, 1883, and as pointed out by the court there were only two provisions in title 20 to which the charter of the association might be referable, namely, subdivisions 2 and 27 of article 566, which read:

"2. The support of any benevolent, charitable, educational or missionary undertaking."

"27. For any other purpose intended for mutual profit or benefit not otherwise especially provided for and not inconsistent with the constitution and laws of this state."

At the time of its incorporation, there was no statute exempting any character of insurance corporation from the general provisions of the insurance laws. By chapter 61, General Laws 19th Legislature, approved March 27, 1885, article 566 was amended by eliminating all of the subdivisions after 24, thus in effect repealing subdivision 27. Article 2971a was enacted as chapter 65, General Laws 19th Legislature, approved March 28, 1885. Since its construction as applied to appellee's charter constitutes a major controversy in the case, we quote the article in full:

"Article 2971a. Nothing in this title shall be construed to affect or in any way apply to mutual relief associations organized and chartered under title 20 of the Revised Statutes, or which are organized under the laws of any other State, which have no capital stock, and whose relief funds are created and sustained by assessment made upon the members of said association in accordance with their several by-laws and regulations; provided, that the principal officer of every such benevolent organization (not conducted by lodges, a quorum of whose members meet in their respective lodge rooms at least once each month), shall be required to make an annual statement under oath to the Department of Insurance on the first day of January of each year, or within sixty days thereafter, showing:

"1. Name of organization and where located.

"2. Name and residence of officers. .

"3. The salary paid each officer.

"4. The gross amount of money received during the year, and from what sources.

"5. The amount paid to policy holders on assessments to pay losses.

"6. The amount paid out for all other purposes, stating in detail what purpose.

"7. Surplus in the treasury if any.

"And should any such benevolent organization refuse or neglect to make an annual report as above required, it shall be deemed an insurance company conducted for profit to its officers, and amenable to the laws governing such companies."

The holding in the Farmer Case was that only under subdivision 2 of article 566 could the association be chartered as a benevolent association, and that it was not a benevolent association within the meaning of subdivision 2 because as found by the court the purpose of this organization was not benevolence, but profit to its officers. The concluding paragraph of the opinion reads: "It is proper to remark here that the appellants can derive no assistance from the twenty-seventh subdivision of article 566, Rev. St., which provides

for the incorporation of mutual relief associations; for that subdivision was repealed before the act of March 28, 1885, was passed. To claim an existence as a benevolent body, at the date of the latter act, it was their duty to show that they were such within the meaning of title 20, as it stood amended when that act was passed."

It is manifest that the court was in error in this paragraph, since chapter 61, Laws of 1885, which was approved March 27, 1885, was passed without an emergency clause and without a record vote; whereas, chapter 65, which was approved the following day, was passed with the emergency and with the requisite vote in each House to make it effective upon its passage.

Close analysis of the opinion in the Farmer Case will, we believe, disclose that its express holding went no further than that the association there under consideration was not benevolent within the meaning of subdivision 2 of article 566, and that it could not claim the benefits of article 2971a as applying to a corporation organized under subdivision 27 of article 566, because as found by the court that subdivision was repealed on March 27, 1885 (chapter 61), one day before article 2971a was passed. By clear implication, however, we think the opinion holds that the association could not in any event come within the purview of article 2971a, in that it was organized for profit and was therefore not benevolent within the meaning of that article. The opinion points out that the record showed that the real purpose of the association was to provide salaries and commissions for its officers.

The last paragraph of the opinion we think clearly left open for adjudication the question whether a corporation organized solely to provide insurance for its members upon the assessment plan, with no capital stock and conducted not for profit, but for the sole benefit of its members, could constitute a mutual relief association within the meaning of article 2971a. By chapter 83, General Laws 23d Legislature (1893), article 566 was amended by adding a number of subdivisions, including 46, reading: "For the organization of fire, marine, life, and live stock insurance companies."

This subdivision was carried forward into the 1895 codification as subdivision 46 of article 642, title 21. It was under this subdivision that appellee was incorporated.

The Burgess Case (appealed from a judgment of dismissal upon order sustaining a general demurrer) was a proceeding to forfeit the charter of the Southwestern Live Stock Insurance Company, which was organized under subdivision 46, article 642, R. S. 1895, "to 'conduct a live stock insurance company or business upon a mutual or co-operative plan without authorized capital stock, and to issue policies of indemnity upon live stock to the members of this association.'" The effect of the holding in that case was, in so far as it relates to article 2971a (article 3096, R. S. 1895), that a mutual assessment live stock insurance association was not a benevolent institution, and was not therefore a mutual benefit association within the meaning of that article. While the appellee in that case urged that the corporation came within that article, the main contention as evidenced by the briefs and the opinion was that the several provisions of the insurance laws were applicable only to insurance companies incorporated under those laws, and did not apply to companies incorporated under the general incorporation laws (subdivision 46 of article 642).

This latter contention was denied, and it is to this contention that the opinion is in the main directed.

It is manifest, therefore, we think that both of these decisions leave open the above question whether a life insurance association organized without capital stock, and conducted for the sole benefit of its members and not for profit, and whose relief funds are created and sustained by assessments made upon its members in accordance with its by-laws and regulations, can constitute a mutual relief association within the meaning of article 2971a (article 3096).

Our study and investigation of this question has led us to the following conclusions:

1. We incline to the view that as an original proposition, the article provides the essentials constituting the proper tests whether such association comes within its terms. These tests are: (1) Chartered under title 20 (title 21, 1895 codification); (2) no capital stock; (3) relief funds created and sustained by assessments made upon the members in accordance with the by-laws and regulations; (4) filing reports with the insurance commissioner, which evidence that it is not "an insurance company conducted for profit of its officers." These are all of the elements prescribed in the article as constituting a mutual benefit association within its purview. The use of the word "benevolent" in two places in the article is adverted to in the Burgess opinion, and a major difficulty in construing the article revolves around a proper interpretation of this word as applied to insurance organizations.

Strictly speaking, as we shall hereafter point out, the providing of mutual assessment insurance, whether or not the element of profit to the officers of the association is involved, would not ordinarily be classed as a benevolent undertaking. But it seems apparent to us that the purpose of the article was to draw a distinction between mutual

assessment insurance. conducted for profit, and that character of insurance conducted solely for the benefit of its members.

■ 2. Aside from this view, however, it seems clear to us that the meaning of the article in this respect is in any event of such doubtful import as to warrant the application of the doctrine of departmental construction.

Our views upon these questions will require some elaboration.

At the outset, it should be clearly borne in mind that the question whether appellee is conducting a life insurance business is not involved. There could be no question raised upon this issue. The business it is conducting and the policies or certificates it writes come clearly within every accepted definition of life insurance. It will not be necessary therefore for us to enter into a discussion of this question. The issue here is not whether appellee is a life insurance association, but whether the insurance it writes under the provisions of its charter constitute it a mutual relief association within the purview of article 2971a (article 3096) as distinguished from "an insurance company conducted for profit to its officers."

As pointed out above, the question presented revolves largely around a proper interpretation of the word "benevolent" as used twice in the act. Broadly speaking, the word implies "merely wishing well to others; beneficence; doing well." It is a broader term than "charity," which it includes, and with which it is frequently used synonymously. Charity in its legal sense implies giving without consideration or expectation of return. Whereas benevolent is applied to any act which is prompted by or has for its object the well being of others. The business conducted by appellee creates contractual rights under which the members or their families receive benefits in the form of specified sums of money upon the happening of certain contingencies, and conditioned upon the payment of dues and assessments. The association engages in no form of charity and no other form of benevolence than what may be implied from the providing of such insurance or benefits without profit. Strictly speaking, as already stated, this business would not be generally classed as a benevolent undertaking.

Corpus Juris (vol. 7, p. 1051) gives the following definition of the character of organization referred to in article 2971a (article 3096): "'Beneficial associations' may be used as a generic term to denote those organizations, whether incorporated or voluntary, which are formed, not for profit, but for the mutual protection, relief, or benefit of their members, or their members' families, relations, dependents, or designated beneficiaries. They are known also as benefit societies,

benevolent societies, and fraternal or friendly societies."

The friendly society of England is the prototype of the American "beneficial association." It is conjectured that the former are "tenuously linked with the mediæval guilds, the numerous objects of which included most of the purposes which the modern friendly society serves." Ency. Brit. (14th Ed.) vol. 9, p. 843. The history and development of these societies is given in the article last referred, to, from which it appears that in organization and benefits conferred the numerous societies are widely variant.

In like manner the American "beneficial associations" present a variety of differences in organization and benefits conferred.

There has been a vast amount of legislation in the several states regulating life insurance which has brought forth a corresponding volume of judicial decisions relative to the status of "beneficial associations" as affected by this legislation.

"In this connection it may be said that whether or not, or to what extent, mutual benefit, fraternal beneficiary, and like associations or societies, are within the meaning of the insurance laws must depend upon the terms of the different statutes, and that the various circumstances of each particular case must also be considered in order to determine whether it is within the intent of the statute or statutes involved. This leaves no common ground upon which to base a governing rule. In fact, even though there may be an underlying principle, it is difficult to apply it, which accounts largely for whatever disagreement exists in the decisions." Cyclopedia of Insurance Law, vol. 1, pp. 604, 605.

For further discussion of this subject, see 7 C. J. pp. 1051–1054; 19 R. C. L. p. 1183; Penn. Mut. L. I. Co. v. Bank (C. C. A. 6th Cir.) 72 F. 413, 38 L. R. A. 33, Taft, C. J., writing, and extensive case note citing authorities.

From these texts and authorities it will be seen that a variety of tests are laid down as distinguishing "beneficial associations" from ordinary mutual life insurance companies. Corpus Juris gives three distinguishing characteristics of these associations:

1. Usually they are formed primarily for social or benevolent purposes, insurance being only incidental and not for gain or profit.

2. Their form of government is representative, ordinarily a lodge system.

3. Their benefits are usually confined to a limited class of individuals.

As to the first of these distinctions, article 2971a requires that the association be not conducted for profit, but otherwise it is silent other than as may be implied from the use of the word "benevolent."

The second distinction to the extent of requiring a representative form of government is prescribed by the article in the use of the words "members" and "by-laws." The article, however, recognizes that a lodge system is not necessary.

The third distinction is necessarily involved in the use of the expression "relief funds," thereby implying, not a general policy of life insurance, but a beneficial certificate affording "relief" for the members and their families or dependents.

■ In so far as the certificates of "beneficial associations" are concerned, they constitute contracts of insurance to which the general principles of such contracts are applicable, the only generally recognized distinction being that in an insurance policy "the rights of the beneficiary are fixed by the terms of the policy, while in the 'beneficial certificate' they depend on the certificate and the rights of the member under the constitution and by-laws of the society." 14 R. C. L. p. 841.

Notwithstanding the fact that their certificates are in effect contracts of insurance, and notwithstanding the further fact that the main object of the organizations may be to provide this form of insurance, benefit societies are often treated and classed as benevolent organizations.

To quote from Corpus Juris (vol. 7, p. 1051): "While beneficial associations are frequently referred to as benevolent societies, strictly speaking they are not such. There is an essential difference between a benevolent society and a beneficial association, in the strict use of those terms, in that the former has for its object the conferring of benefits without requiring an equivalent from the one benefited, in which case it may be a charity. At the same time, the terms 'beneficial' and 'benevolent' are frequently used interchangeably, so far as the present subject is concerned, both in statutes and in judicial opinions."

The basis for the distinction from life insurance companies generally and the classification as benevolent lies in the purpose for which they are organized. From 19 R. C. L. p. 1178, we read: "Beneficial associations are * * * formed and organized, not with a view to the accumulation of wealth and the making of profit, but, aside from fraternal objects, solely for the purpose of rendering financial aid or other assistance to their members, or certain designated beneficiaries of the latter, when visited by sickness, death or other misfortune specifically agreed upon."

A mere cursory review of the history of these organizations will disclose a gradual evolution from purely social and charitable societies into the modern "mutual benefit society" in which the main object of the societies is to furnish a limited amount of mutual assessment insurance to their members and their dependents. The fact that they distribute "benefits" or "relief" in accordance with certificates which create contractual rights governed generally by the principles applicable to insurance contracts has not in many instances been held sufficient to remove such "benefits" and "relief" from the classification "benevolent."

That the paramount consideration upon which the court in the Farmer Case held the defendant corporation not to be a benevolent organization was in the fact that it was organized, not for the sole benefit of its members, but for the profit of its officers, seems manifest from the following quotation: "The evil the statute intended to remedy was the conducting of an insurance company for the profit of its officers, under the guise of benevolence and in evasion of the insurance laws. The statute recognizes the existence of mutual benefit societies claiming to be benevolent. It proposes to test whether they are really so, or carried on for the profit of their officers. *It gives them an opportunity of establishing their benevolent nature by reporting certain named facts from which this question can be determined.* If they fail to make the report, the presumption is conclusive that it would disclose their object and effect to be the emolument of their officers by means of a life insurance business. If the report showed this to be their true character, they were not to be exempted from the burdens imposed on other insurance companies. There was not such virtue in the report itself as would shield the society from the consequences of an act against which the statute was attempting to provide. If the report upon its face showed that the purpose of the organization was benevolent, no conclusive presumption to that effect was established. The society could not protect itself by incorrect statements. The state used the best means it could suggest to call to account such corporations as were flying the flag of benevolence and yet doing business for the benefit of its officers. If this failed to disclose their true character, it did not intend to deprive itself of all power to ascertain that character by other appropriate evidence,—to allow violators of the law to escape upon their own statement of their innocence." (Italics ours.)

■ We think, therefore, that it is a reasonable construction of article 2971a that an association, although having no lodge system, and engaging in no form of charity or benevolence (other than as may be inferred from the benefits accruing under its certificates), would come within its purview if possessing the elements expressed or necessarily implied from the language of the article as outlined in the above discussion. In any event, we think the article of sufficiently doubtful meaning to warrant this interpreta-

tion in applying the doctrine of departmental recognition.

The record shows in this regard that from the filing of its charter up to the filing of this suit appellee has continuously operated in this state, paying the requisite franchise taxes as they accrued, and building up a large organization with several thousand members holding certificates aggregating $40,000,000. During the named period there has never been any adverse action taken against appellee by the insurance department, or any other department of government. The insurance department (originally the department of insurance, statistics and history) was created in 1876 (Acts 15th Leg. c. 133). By the first section of the act of its creation, it was "charged with the execution of all laws now in force, or which may hereafter be enacted in relation to insurance, and insurance companies doing business in this State." This provision, first as to the department, and later as to the insurance commissioner, has been carried forward continuously in the statutes. The reports of this department, regularly filed annually or biennially, show diligent effort on the part of each succeeding commissioner, not only to see that the insurance laws were carried out, but to recommend from time to time changes in legislation that would afford better protection to the public. The reports are replete with data and the results of investigations regarding the methods employed by various organizations doing business in this state. The sharp competition between rival insurance companies has been an important factor in bringing to notice of the department evasions and violations of the insurance laws. It is inconceivable that the department was not fully aware of the existence and nature of the business conducted by appellee and other similar corporations organized about the same time; or that proceedings would not have been instituted against them had the department not construed their operations as being authorized by law. It should also be borne in mind that appellee was incorporated about seventeen years after the decision in the Farmer Case was handed down, and several years before the Burgess suit was brought, at which latter date it, and several other similar corporations, were doing business in the state. That it was not molested we think can reasonably be attributed only to the fact that the insurance department and the Attorney General regarded its business as lawful.

■■ These considerations we think clearly make applicable a well-recognized general rule which Ruling Case Law (vol. 25, pp. 1043–1045) states as follows: "It is a well settled rule that the contemporaneous construction of a statute by those charged with its execution and application, especially when it has long prevailed, while not controlling, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous. The courts are especially reluctant to overturn a long standing executive or departmental construction where great interests have grown up under it and will be disturbed or destroyed by the announcement of a new rule, or where parties who have contracted with the government upon the faith of such construction will be prejudiced."

We had occasion recently to apply this rule in R. R. Com. v. Ry. Co. (Tex. Civ. App.) 42 S.W.(2d) 1091 (error refused). A well-considered case directly in point is Westerman v. Supreme Lodge, 196 Mo. 670, 94 S. W. 479, 5 L. R. A. (N. S.) 1114. Many other decisions of like import might be cited.

■ The rule does not apply where the language of the statute is plain, unambiguous, and not open to construction. But, as above shown, we do not so regard article 2971a.

■ We will now consider the state's contentions regarding the effect of subsequent legislation upon the rights of appellee.

By chapter 150, pp. 291, 292, § 3, General Laws of 1907 (30th Leg.), subdivision 46 of article 642, was amended by adding the following: "Provided, that such livestock insurance companies may be organized with an authorized and paid up capital stock of not less than ten thousand dollars; *and provided further, that all insurance companies mentioned in this subdivision shall be in all other respects subject to and shall comply with all of the provisions of Title 58, of the Revised Statutes of Texas, and any and all laws supplementary to or amendatory thereof.*" (Italics ours.)

It may be noted in passing that no mention is made in the caption of the italicized proviso, and for that reason it was unconstitutional. The proviso was, however, re-enacted in the 1911 (article 1121, subd. 46) and 1925 codifications (article 5037), and no importance attaches therefore to its original invalidity.

Appellant contends that this amendment repealed by necessary implication article 2971a as to all corporations theretofore, as well as thereafter, chartered under subdivision 46 of article 642. Appellee contends that the amendment had no reference to mutual relief associations, and, in any event, was not retroactive, but related only to corporations thereafter chartered.

This amendment was passed after the decision adverse to the state was made by the trial court in the Burgess Case, and before the case reached the Supreme Court. The amendment is not adverted to in the Supreme Court's opinion, and an examination of the application for writ of error, which was signed by Attorney General Davidson and As-

sistant Attorney General W. E. Hawkins, will show that no claim was made that the amendment had any retroactive effect. We quote from the application in this regard: "This legislative action, which we happen to know was the direct result of said decision of said trial court in this cause, fairly indicates, not that the Legislature had not previously intended that live stock insurance companies should be subject to the supervision and control of the Commissioner of Insurance, but that it was the express intention and determination of the Legislature to make that intention and desire so clear and explicit that there shall hereafter be no room for a construction of the statute which would exempt live stock insurance companies from such supervision and control and from the restrictions and safe-guards provided in R. S. Title 58."

It should be borne in mind that the main contention of appellee in the Burgess Case was that the insurance statutes had reference only to corporations chartered under the insurance title, and had no application to those chartered under the general corporation title (article 642); and Judge Williams' opinion is, in the main, addressed to this contention. This being the main controversy in the case, and the trial court's decision being the occasion of the amendment, it was no doubt the legislative purpose to set this question at rest, at least as regards insurance companies thereafter chartered under subdivision 46, art. 642. Had it been the legislative intent to repeal article 2971a, or to make the amendment retroactive, such intention could readily have been expressly embodied in the amendment. This subject will be further discussed in connection with later legislative enactments.

Article 3096w was expressly repealed by the Act of 1909 (Gen. Laws 1909, chap. 108), and article 2971a (3096) was repealed by omission from the codification of 1911. It is the state's contention that the effect of these repeals was to deny to appellee any further right of exemption from the general insurance laws which it might theretofore have had under the repealed articles, and either to repeal the charter altogether or to suspend appellee's right to do business unless and until it brought itself within the provisions of the insurance laws. The power of the Legislature to repeal, as well as to alter, reform, or amend the charter of a private corporation created under the general incorporation laws may be conceded. The latter power to alter, reform, or amend is expressly reserved by statute (act of 1874, present article 1318). The questions presented are therefore narrowed down to the legislative intent in repealing these articles.

It is a well-recognized principle that: "Repeals (of charters) by implication are possible, but are not favored, and the act will not be held to repeal the charter unless there is an express intention to do so or a necessary implication to that effect arising from the enactment." 14a C. J. p. 1102.

A leading case upon this subject is Bibb v. Hall, 101 Ala. 79, 14 So. 98.

The principle is applied where a general act under which corporations have been chartered is repealed; in which case, in the absence of express intention to the contrary, "the corporations continue to exist and be governed by the provisions of the act, under which they were organized." See 1 Thompson on Corporations, p. 468; 14a C. J. p. 1102; 2 Spellman on Private Corporations, p. 1214; Moravitz on Corporations, § 1110.

We think it clear that it was not the legislative intent to repeal the charter of any corporation created under article 642, subd. 46.

But, contends the state, the effect of the repeal of these two articles and the amendment to subdivision 46, art. 642, was to require appellee to conform to the requirements of the insurance laws as a condition precedent to its further right to do business.

A complete answer to this contention lies, we think, in the fact that to give the legislation this construction would work such a radical change in appellee's charter as to amount virtually to a repeal. It would require a change from a corporation without capital stock to one with capital stock of not less than $100,000. It would also require an entire readjustment of its plan of insurance and rates so as to meet the requirements as regards policy provisions. There is nothing on the face of any of this legislation to indicate such an intention; and it seems to us clear (conceding the original validity of appellee's charter) that had the Legislature so intended it would have so stated in express terms and given a reasonable time in which to comply, as was done with reference to abstract and title insurance corporations in the enactment of chapter 40, p. 77, Gen. Laws 41st Leg. (1929).

What we have heretofore said with reference to departmental construction applies with equal force here. Appellee has been doing business with manifest knowledge and consequent tacit approval of the insurance department for about eighteen years, since the last of these enactments (1911) up to the filing of this suit. If appellee can fairly bring itself within the exemption provided in article 2971a (3096), we do not think its corporate existence should now be disturbed through judicial action. Its continued right to do business in that event is one of policy which addresses itself to the Legislature, and with that branch of the government should rest its future. The subject was brought to the attention of the 41st Legislature through committee amendments to H.

B. No. 605, but no pertinent legislation was enacted.

Appellee contends that its legality has had express legislative recognition and resultant sanction in the following enactments:

■ 1. Section 29 (page 569) of chapter 274, Gen. Laws of the 41st Leg. (1929), Vernon's Ann. Civ. St. art. 4875a—29, "regulating Local Mutual Aid Associations," contains under the heading "Exemptions," the following: "The provisions of this act shall not apply to * * * any society or association if any, heretofore legally operating state wide on an assessment basis under any charter heretofore granted under any valid statute of this State."

The validity of the statute under which appellee was chartered is not questioned. The exemption, however, expressly applies only to such organizations as were theretofore "legally operating." There is no legislative recognition of the "legality" of appellee's "operations." The act therefore leaves this question open for adjudication.

■ 2. Chapter 150, p. 251, Gen. Law, Reg. Sess. 42d Leg. (1931), Vernon's Ann. Civ. St. art. 1995, subd. 28a, fixed the venue in suits brought on policies and contracts issued by "statewide Mutual Assessment Companies" (among others). This was a clear recognition that such organizations existed and were doing business in Texas, but we do not think it constituted legislative recognition of the legality of their incorporation or of their methods of doing business. Illegality in this regard could not be asserted by them in actions upon their contractual engagements, and the act, we think, should be given no further effect than to provide a forum for such actions.

The most that can be said of these two acts is that they evidence legislative knowledge of appellee's existence and business operations.

■ We think the paramount question which the case presents is whether appellee comes within the exemption provided in article 2971a (3096). Since appellee derives its existence and right to do business under article 642, subd. 46, and would clearly be amenable to the general insurance laws unless it comes within the purview of article 2971a, we are clear in the view that the burden rests upon it to show this fact affirmatively, when its legal rights in that regard are brought in question by the state. In one respect, at least, the statement of facts fails to make this showing, namely, that appellee is operated for the sole benefit of its members and not for profit. The agreed statement shows that the following sums were required from each member holding $1,100, $2,000, $2,500, and $5,000 certificates, respectively:

Annual dues $3, $4, $5.50, and $5.50; special annual assessments to be "used for the general fund," $1.80, $2.40, $5.50, and $5.50; and 20 cents, 40 cents, 50 cents, and 50 cents, respectively, as a part of each death assessment above the amount going to the beneficiary for whom the assessment was levied. The record does not afford the means of estimating the total of these sums, but the following does appear, based upon a total of $40,000,000 insurance and the assumption that all certificates were in the same amount:

| Amt. of Cert. | Total Membership | Ann. Dues | Annual Genl. Fund | Total |
|---|---|---|---|---|
| $5,000 | 8,000 | $ 44,000 | $44,000 | $ 88,000 |
| $2,500 | 16,000 | $ 88,000 | $88,000 | $176,000 |
| $2,000 | 20,000 | $ 80,000 | $48,000 | $128,000 |
| $1,100 | 33,333 | $100,000 | $60,000 | $160,000 |

The gross receipts from these two sources is therefore between $88,000 minimum and $176,000 maximum, the general average being $133,000. This does not take into account the sums arising from death assessments in excess of the sums paid beneficiaries, of the amount of which the record furnishes no basis of calculation. The record is entirely silent regarding the manner in which these large sums are expended. That appellee operates for the sole benefit of its members and not for profit is a prime characteristic distinguishing it as a "mutual relief association," within the purview of article 2971a (3096); to show which, as stated, the burden rested upon it.

■ Should it develop upon another trial that appellee is not a "mutual relief association," within the meaning of article 2971a (3096), and that it therefore has no right to continue to do business under its present plan of organization, the remedy of forfeiture which the state seeks would doubtless work great hardship to a large number of appellee's members who have acquired their certificates in the honest belief that appellee's corporate existence and business methods are legal. That these innocent parties should be accorded such protection as the court may legally afford is manifest. The equity powers of the court are ample, we believe, to afford relief to the extent of granting to appellee a reasonable time within which to comply with the insurance laws, should such compliance prove feasible. We cannot, of course, forecast what the evidence may show in this regard; but in view of the long-standing departmental recognition of appellee's legal rights, the large organization it has built up, and the large number of members who have dealt with it in good faith, we are clear in the view that every lawful effort should be made, in enforcing the rights of the state to minimize the resulting hardships to appellee's members.

The trial court's judgment is reversed, and the cause remanded.

Reversed and remanded.

On Motions for Rehearing by Appellant and Appellees.

■ Appellees contend that we were in error in holding that the burden of proof rested upon them to make the showing required under article 2971a, R. S. 1879 (Laws 1885, c. 65) as a prerequisite to their right to do business as a mutual relief association, citing Legion of Honor v. Story, 97 Tex. 264, 78 S. W. 1, and Grand Lodge v. Moore (Tex. Civ. App.) 154 S. W. 362.

The distinction between those cases and the case at bar is that there it was shown that the defendants were mutual relief associations, and such being a fact, the burden rested upon plaintiffs, who sought to collect the statutory penalty and attorney's fees, to show that the associations had failed to file the requisite reports under article 2971a. We have here a different case. Appellee corporation did not file the reports. It is true it offered to do so, and that fact may excuse it from such filing; but we do not think it was relieved from showing the contents of such proffered reports, or, in any event, the facts which the article required such reports to show. As pointed out in our original opinion, certain facts were shown by the record, and from these facts it appeared that large sums of money were collected which did not go to the beneficiaries. No showing whatever was made as to how these funds were expended as provided for in subdivisions 3, 4, 5, 6, and 7 of the article. These facts were peculiarly within the knowledge of the corporation; and we believe the burden was on it to show how these funds were expended, so that the court might pass on the question whether it was a mutual relief association within the purview of the article; or was operated for profit of its officers.

■ The state contends in its motion that since appellee corporation failed to meet this burden, it was entitled to judgment; and we should therefore render such judgment as the trial court should have rendered under the agreed statement of facts. Whether the Court of Civil Appeals upon reversing the judgment of the trial court should render judgment for the appellant depends upon whether it appears from the record that the case has been fully developed, and the appellant is entitled to recover as a matter of law under any theory which the record presents or might present. It is manifest from the agreed statement of facts that the case has not been developed upon the issue of whether appellee corporation was operated for profit; the record being silent as above stated with reference to the expenditure of its funds. Under these circumstances, it is the uniform practice to remand the case for further trial.

Buzard v. Bank, 67 Tex. 83, 2 S. W. 54, 60 Am. Rep. 7; Ry. v. Seabold (Tex. Civ. App.) 277 S. W. 229, and authorities there cited.

Both motions are overruled.

Overruled.