AIR FORCE VILLAGE FOUNDATION,
INC., Appellant,

v.

NORTHSIDE INDEPENDENT SCHOOL
DISTRICT et al., Appellees.

No. 6625.

Court of Civil Appeals of Texas,
El Paso.

Jan. 25, 1978.

Rehearing Denied Feb. 22, 1978.

Hardberger, Branton & Herrera, Inc., James L. Branton, San Antonio, Hackler, Londerholm, Speer, Vader & Austin, Eugene T. Hackler, Robert C. Londerholm, Olathe, Kan., for appellant.

Dobbins, Harris & Gonzalez, William P. Dobbins, Richard W. Harris, Jane Macon, City Atty., Sparta Bitsis, Asst. City Atty., Bill M. White, Dist. Atty., Ray Simpson, Asst. Dist. Atty., San Antonio, for appellees.

## OPINION

WARD, Justice.

This is a tax suit instituted by Northside Independent School District to collect ad valorem taxes on the property of Air Force Village Foundation, Inc., for the years 1972 through 1975. The City of San Antonio, the State of Texas, and the County of Bexar intervened claiming ad valorem taxes for the same period. The Foundation defended on the basis that its property was exempt from such taxation as the property of an institution of purely public charity within the meaning of Article 8, Sec. 2, of the Texas Constitution, and Article 7150, Sec. 7, Tex.Rev.Civ.Stat.Ann. Trial was to a jury with three special issues being submitted. The jury determined by its answers to the first two that the Foundation was bound by its charter and its by-laws to, and in fact did, dispense its aid to those in sickness or distress without regard to the poverty or riches of the recipient. By the third issue, the jury, after having been directed to consider an evaluation of the total operation of the institution, answered that for each of the taxable years in question the institution was not a purely public charity. The Court thereafter entered judgment holding that Appellant was not an

institution of purely public charity, was not exempt from ad valorem taxes, and granted judgment for taxes, penalties, and interest for the years in the total sum of $505,-593.67. We affirm.

The property is known as Air Force Village and is located in San Antonio. The institution is described as a retirement home for the aged providing a wide range of care and services to meet their special needs, including housing, medical care, a licensed nursing home section, meals and dietary supervision, religious, educational and social activities. The property includes a high rise building with 216 apartments with a community center, dining room, chapel, music room, library, laundromat, cafeteria, infirmary, and beauty parlor. In addition to the main building, there are 32 apartments on the outside known as garden apartments. A licensed nursing home section is located in the main building.

Air Force Village Foundation, Inc., is a non-profit corporation organized under the laws of the District of Columbia and with a permit to do business in Texas. Its charter provides that its basic purpose is to provide elderly persons with housing facilities and services specially designed for their needs. Any charges therefor are to be predicated on a charitable and non-profit basis, and no part of the income or assets of the corporation will ever be distributed to any individual; and in the event of dissolution, no part of the property shall be distributed to any individual or organization created for profit, but shall be distributed to the Air Force Aid Society, if in existence, otherwise, distribution shall be made to another charitable organization which is exempt for federal tax purposes.

Those eligible to reside in the home, as stated in the institution's by-laws, are retired Air Force officers, their spouses and dependents, and their widows. Widows of reservists are admitted if the reservist was killed on active duty, or a career reservist retired from the service after 20 years of active duty. As a matter of actual operating policy, all branches of the service are admitted to the home, and the composition of the residents as related to the branches of service shows 71% Air Force, 22% Army, and 7% Navy and Marine. The ratio of women to men is 2 to 1, and the average age is approximately 70 years. A person must be 62 years of age to enter the home and residents are composed of 35% officers, 30% spouses, 20% widows, and 8% dependents. The Foundation requires a deposit of $500 for one person and $750.00 for a couple from all prospective residents to insure that they are placed on the waiting list for admission, there being some 482 prospective residents on the waiting list who have paid the required deposit. The Foundation then requires the payment of a life-care or entrance fee ranging from $11,000.00 to $26,-500.00. After admittance, the residents are then charged a monthly service charge ranging from $203.70 to $386.40, all higher prices being for the garden apartments. All funds received by the Foundation are used for its operation and no private profit inures to any person. The Foundation has operated at a loss each year except for its first year. Nevertheless, the evidence shows that the Foundation has paid off a note to Frost National Bank in the amount of $1,000,000.00 and has repaid $160,000.00 on a note to Banker's Life Insurance Company. According to testimony offered by the Foundation, no eligible person seeking admittance has ever been turned down or, after admittance, been discharged for inability to pay, and potential residence are so advised by literature distributed throughout the Air Force. A fellowship fund has been built up over the years from donations to take care of persons with financial needs. Testimony is present that there is a policy that no less than one-third of the residents be persons receiving charitable assistance.

However, as developed from the facts, during 1972 through 1975 an average of only 5% of the monthly maintenance fees were waived by the Foundation and an average of only 5.48% of the life-care or founders fees were waived. As to the nursing home, which furnishes limited care, during the period there was a total of 77 admissions to the nursing home of which three were persons receiving some assistance

from the Foundation. Regarding the testimony that indigent residents are solicited, the only testimony justifying the small number of persons actually receiving charitable assistance is from the administrator saying that pride would not permit others to come forth and apply.

The special issues to sustain the Foundation's theory that it was entitled to an exemption as a purely public charity were submitted to the jury without objection. The issues, together with the jury's answers thereto, are as follows:

"ISSUE NO. 1

"Do you find from a preponderance of the evidence that during the years 1972, 1973, 1974 and 1975 Air Force Village Foundation, Inc. dispensed its aid to those in sickness or distress without regard to the poverty or riches of the recipient?

"Answer 'It did' or 'It did not,' with regard to each year.

"Answer: 1972  IT DID
1973  IT DID
1974  IT DID
1975  IT DID

"Do you find from a preponderance of the evidence that Air Force Village Foundation, Inc. is bound by its charter and by-laws to dispense such aid to those in sickness or distress without regard to the poverty or riches of the recipient?

"Answer: 'It is so bound' or 'It is not bound,' as to each year.

"Answer 1972  IT IS SO BOUND
1973  IT IS SO BOUND
1974  IT IS SO BOUND
1975  IT IS SO BOUND

"ISSUE NO. 3

"Do you find from a preponderance of the evidence that Air Force Village Foundation, Inc. is a 'purely public charity' as that term is defined by law?

"You are instructed that by the term 'purely public charity,' is meant an institution that makes no gain or profit; accomplishes ends wholly benevolent; and benefits persons indefinite in numbers and in personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the state.

To be a 'purely public charity,' it must dispense its aid without regard to the poverty or riches of the recipient and be bound by its charter and/or by-laws to do so.

"You are further instructed, however, that in applying this definition to the facts and evidence in this case, you may consider the following:

"1. The fact that paying residents predominate over those unable to pay does not detract from the charitable nature of the service rendered;

"2. Reliance upon percentages of paying residents versus non-paying residents should not be the controlling factor;

"3. Charity is something more than mere alms-giving or the relief of poverty and distress;

"4. The ultimate consideration should be based upon an evaluation of the total operation of the institution engaged in humanitarian activities whose services are rendered at cost or less and which are maintained to care for the physical and mental well-being of the recipients. By that total operation the institution must assume, to a material extent, that which otherwise might become the obligation or duty of the community or the state.

"Answer: 'It is a purely public charity' or 'It is not a purely public charity,' as to each year.

"Answer 1972  IT IS NOT A PURELY PUBLIC CHARITY
1973  IT IS NOT A PURELY PUBLIC CHARITY
1974  IT IS NOT A PURELY PUBLIC CHARITY
1975  IT IS NOT A PURELY PUBLIC CHARITY "

Evidently, the first two issues are a submission of elements contained in the wording of Section 7, Article 7150, Tex.Rev.Civ. Stat.Ann., and the last is a submission of the Supreme Court's overall interpretation of the Section as set out in *City of McAllen v. Evangelical Lutheran Good Samaritan Society*, 530 S.W.2d 806 (Tex.1975).

The Defendant's first group of points present the legal proposition that as a matter of law the evidence conclusively proved that during the years in question the Defendant was a purely public charity and entitled to the exemption under Article 8, Sec. 2, of the Texas Constitution, and Section 7 of Article 7150, Tex.Rev.Civ.Stat. Ann. We are therefore required to examine the record for evidence which supports the jury's finding to the last issue while ignoring all evidence to the contrary.

■ Certain ground rules applying to purely public charities are noted. Exemption statutes are not favored since they create exceptions to the primary goal of equality in taxation; they throw a greater burden on other taxpayers. Thus, the exemption enactment is to be strictly construed against the party claiming it, and the burden of proof is placed on the potential taxpayer to show by facts that its property comes clearly within the reach of the exemption. *Santa Rosa Infirmary v. City of San Antonio*, 259 S.W. 926 (Tex.Comm. App.1924, jdgmt. adopted); *River Oaks Garden Club v. City of Houston*, 370 S.W.2d 851 (Tex.1963); 21 Texas Practice (Howell), Property Taxes, Sec. 4 (1975).

Up to the present, institutions in the health-care field have always claimed the exemption as being purely public charities under Section 7 of Article 7150, Tex.Rev. Civ.Stat.Ann., and the general requirements under the Statute have become established. However, the different types of care provided in the individual institutions have sometimes produced different results. See Hartt, "Ad Valorem Taxes and Non-Profit Health-Care Facilities," 39 Tex.B.J. 864 at 868 (1976). As pointed out in this article, there is considerable uncertainty in the field where institutions similar to Air Force Village Foundation, Inc., have attempted to claim the exemption, the exemption being favored when it was determined that the institution was primarily a nursing home rather than when it was determined that it was a retirement community. See Annot. 45 A.L.R.3d 610.

■ The same held true in this State at least up until the time of the decision in *City of McAllen v. Evangelical Lutheran Good Samaritan Society,* supra. Each of the last cases that have dealt with a retirement community facility has emphasized that the operation was primarily for the benefit of the members and not for the benefit of society and the exemption has been denied. See *Hilltop Village, Incorporated v. Kerrville Independent School District,* 426 S.W.2d 943 (Tex.1968); *City of Waco v. Texas Retired Teacher Residence Corporation,* 464 S.W.2d 346 (Tex.1971); *Hilltop Village, Inc. v. Kerrville Independent School District,* 487 S.W.2d 167 (Tex. Civ.App.—San Antonio 1972, writ ref'd n. r. e.); *Challenge Homes, Inc. v. County of Lubbock,* 474 S.W.2d 746 (Tex.Civ.App.— Eastland 1971, writ ref'd n. r. e.). However, it is not so much what was decided in those cases as it is as to how far their holdings have been modified by the Supreme Court in *City of McAllen v. Evangelical Lutheran Good Samaritan Society,* supra. There, the Court was dealing with a nursing home where all patients who were admitted were under a doctor's care. The home operated at a loss, but even when profits were made, they would go for mortgage payments, debt service, capital improvements, and other activities directed at sustaining and furthering the Society's benevolent activities. The Court reaffirmed its position that the proscription in this State against an institution's realization of gain or profit refers only to gain or profit by private individuals or the accrual of distributable profits. Nor is the exemption to be defeated by the requirement that patients able to pay are required to pay for the services rendered. The Court emphasized the fact that no person who applied for treatment or care at the nursing home was denied admission, or was discharged because of poverty or riches, and the fact that paying patients predominated over those unable to pay would not detract from the charitable nature of the service rendered. Further, the record justified the trial Court's finding that the screening requirements being used by that institution

were not used to screen out charity patients. The Court recognized that today most indigent patients are entitled to various benefits from wide-ranging assistance programs. It redefined the absolute gratuity requirement as meaning that such charity as was extended, that is, the portion of the cost not covered by government funds, must be of an "unconditional nature." Of most importance to the disposition of the present case was the Court's conclusion which is as follows:

"* * * The ultimate consideration then, should be based upon an evaluation of the total operation of the institution engaged in humanitarian activities whose services are rendered at cost or less and which are maintained to care for the physical and mental well-being of the recipients. By that total operation the institution must assume, 'to a material extent, that which otherwise might become the obligation or duty of the community or the state.' * * * " (p. 810).

As seen, Special Issue No. 3 submitted this "ultimate consideration" to the jury and the fact finder answered the issue to the effect that it was not a purely public charity.

■ The evidence supported that finding. The witnesses testifying for the Defendant, insofar as the operation of the institution was concerned, were all interested witnesses. While uncontradicted by other witnesses, there are circumstances present which tend to cast suspicion thereon. Also, different conclusions can with reason be arrived at by reasonable minds from the testimony. 3 McDonald, Texas Civil Practice, Sec. 11.-28.6, p. 247 (1970). Although the charter of the organization mandates that at least one-third of the residents be persons in need of charity, the facts remain that over a period of several years, the organization has been unable to attract persons in need of charity to become residents of the home. The jury was entitled to become skeptical of any real effort to attract these people. As to the true recipients of the benefits made available by Air Force Village, most of the residents of Air Force Village were high-ranking officers and their spouses or widows. The attraction in fact was made

to members of a class of persons who would normally be considered as not being in need of any charitable assistance. That fact alone would not prevent an institution from being a charity but would be a factor to be considered by the jury. The amount of charity administered by Air Force Village was small opposed to the sums lost by the taxing authorities as tax revenue. The percentage of residents receiving charity was extremely little when compared to the percentage of residents paying the full charges assessed by the organization. These facts could have led the jury to form the reasonable conclusion that Air Force Village was an institution structured as a comfortable retirement home for retired officers and their spouses, and was not an institution structured in either form or operation so as to meet the special residential requirements of elderly persons under distress circumstances. The jury could therefore believe that the institution, from its organization and its actual operation, did not assume to a material extent any obligation or duty of the community or the State. The Defendant failed to establish as a matter of law that it was a purely public charity and the first group of points are overruled.

■ Next, we are of the opinion that no conflict exists between the jury's affirmative answers to Issues Nos. 1 and 2, and the negative answers made to Issue No. 3. The findings to Issues Nos. 1 and 2 established only a portion of the necessary elements to establish a purely public charity. Another element such as the total operation was necessary. The point asserting such conflict is overruled.

■ The Defendant next complains of the exclusion by the trial Court of its Exhibit No. 74 which purported to document what it would cost the United States Government to furnish the care that was provided by the nursing wing of Air Force Village. It did not attempt to specify care furnished to residents receiving charitable assistance. A large part of the residents of the retirement home were entitled to medical care and treatment at the United States

Government hospitals in San Antonio as retired military personnel, or as widows or dependents. We fail to see where the exhibit would have shown how much the Defendant was relieving a burden that otherwise would be the obligation of the State or the community. The point is overruled.

■ The Defendant called the Administrator of the Southwest Texas Methodist Hospital who testified that the hospital was exempt from taxation as a purely public charity. The Defendant then attempted to determine what percentage of free care was offered by the hospital. The testimony was excluded. In a bill of exception it was shown that the percentage of non-paying patients amounted to approximately 4% of its total annual budget in terms of charity care with an equal amount for bad debts. We perceive no error in excluding the evidence. Whatever percentage of free care that might have been furnished by a different type of institution would not have been instructive of the tax status of Air Force Village.

The Defendant's final point complains of argument of counsel. We have reviewed the argument and the complaint is overruled.

The judgment of the trial Court is affirmed.