The STATE of Texas,

v.

The ALLIANCE VILLAGE, INC.

No. 1441.

Court of Civil Appeals of Texas, Corpus Christi.

Dec. 28, 1979.

Rehearing Denied Jan. 17, 1980.

---

Robert L. Galligan and Cindy L. Miller, Smith, McIlheran, Lauderdale & Jones, Weslaco, for appellant.

Fred E. Davis, Davis, Davis & Sharp, Austin, for appellee.

## OPINION

YOUNG, Justice.

This is an appeal from a suit in which a nursing home was found to qualify as a purely public charity and entitled to an exemption from ad valorem taxation. The State of Texas instituted this suit for itself and on behalf of other taxing entities for delinquent taxes for the years 1971 through 1976 on property owned by the Alliance Village, Inc., appellee. Appellee Village defended on the grounds that as a public charity it was exempt from taxation. The case was tried to the court without a jury. The trial judge found that appellee was a public charity and therefore exempt from ad valorem taxation for the years 1971 through 1976. We affirm.

Alliance Village, Inc., (Village) was a non-profit corporation duly incorporated in the State of Texas in November, 1967. The articles of incorporation set out the perpetual nature of the corporation and its purpose: ". . . to establish, as a benevolent and missionary undertaking, a home for retired ministers and missionaries and other people, with provisions for para-medical nursing and hospital facilities."

The evidence presented the Village as a subsidiary of the Christian and Missionary Alliance, a nation-wide organization of affiliated churches. The Alliance is divided

into many districts, one of which is the Southwestern District that oversees the operation of the Village.

The Village, before its sale in 1977, was controlled by a Board of Directors, the chairman of which was the district superintendent of the Southwestern District of Christian and Missionary Alliance. Day-to-day operation of the Village was managed by an administrator, who functioned under the board's supervision.

The Village began operations in 1967 with the idea of ". . . provid(ing) a nursing staff who are devoted to the ministry of caring for the aged and sick." By doing so, the Village should ". . . adequately fill an important community need" according to its "Objective and Admissions Policy." The By Laws set out the following purpose:

> "It shall operate strictly as a non-profit corporation, as stated in the Articles of Incorporation, for the purpose of providing care on a custodial basis, an intermediate basis and an extended care basis for the aged, infirm, and/or retired pastors and missionaries of the Christian and Missionary Alliance, and others who need and desire such care."

Further, the evidence shows that admission to the facility was permitted only upon the recommendation of the patient's physician. A patient was under that physician's supervision during his or her stay at the Village. There was an open admissions policy in which no patient was refused admittance on account of race, creed, color, or ability to pay. The assistant administrator of the Village testified that 40 percent of the residents were provided care without any payment or with only partial payment. Even though the articles of incorporation specifically included ministers and missionaries as residents of the Village, no ministers and only two missionaries received care.

Fiscally, the Village always operated at a loss. In each year of operation the debt increased substantially. In January of 1977, the corporation was dissolved and all assets sold to pay the debts. Even after the Village was sold and the income applied to the outstanding liabilities, there still remained a $300,000.00 debt.

This suit was instituted by the State of Texas to recover delinquent ad valorem taxes on property owned by the Village for the years 1971 to 1976. Part of the taxes in question were stipulated to by the parties. The Village claimed an exemption, however, from ad valorem taxes for that part of the land upon which the nursing home is located and the personal property used in connection with the home.

In this appeal the State brings forward seven points of error. All seven points of error pertain to the Village's status as a purely public charity. The State contends that the Village failed to meet its burden of proof in establishing that the Village did qualify as a purely public charity and therefore was not exempt from ad valorem taxation.

Public charities in our State have been given tax-exempt status by the Constitution. Tex.Const. art. VIII, § 2. In order to qualify as a public charity, the institution must ". . . dispense(s) its aid to its members and others in sickness or distress, or at death, without regard to poverty or riches of the recipient, also when the funds, property and assets of such institutions are placed and bound by its laws to relieve, aid and administer in any way to the relief of its members . . ." Tex.Rev.Civ.Stat. Ann. art. 7150, § 7 (1960). This broad definition of purely public charity has been refined by the Courts of this State in a case-by-case application to the particular purpose and character of the institution seeking tax-exempt status.

■ This Court has had the opportunity to examine nursing homes as public charities in the case of *City of McAllen v. Ev. Lutheran Good Samaritan Society*, 518 S.W.2d 557 (Tex.Civ.App.—Corpus Christi 1975) *aff'd*, 530 S.W.2d 806. In the *Good Samaritan* case, both this Court and the Supreme Court carefully reviewed the requirements for obtaining tax-exempt status as a purely public charity. A three-pronged

test was established to qualify organizations as purely public charities:

> "First, it made no gain or profit, second, it accomplished ends wholly benevolent; and, third, it benefited persons, indefinite in numbers and personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the state." *Good Samaritan*, supra at 808–09; *City of Houston v. Scottish Rite Benevolent Association*, 111 Tex. 191, 230 S.W. 978, 981 (Tex.Sup.1921).

We will apply this three-pronged test to the facts of this case in order to determine whether the Village qualified as a purely public charity.

■■■ The first part of this test, whether the Village made any gain or profit, can be answered by looking at the financial statements found in the transcript. Not only did the Village operate at a day-to-day loss in terms of expenses exceeding revenues, but the long-term financial status of the Village was one of additional losses when debt services and other liabilities were included in the statement. In each year of operation the debt grew larger, so large that even a sale of the assets could not pay all the liabilities.

There was no "gain or profit" made by the Trustees or administrators either. In the *Good Samaritan* case the Supreme Court insured that a financial statement could not be structured so that the institution might operate at a loss but the officers and administrators might be receiving exorbitant salaries or other forms of compensation. *City of McAllen v. Ev. Lutheran Good Samaritan Society*, supra at 809. Administrators at the Village were compensated with a reasonable salary for their efforts, but there was no attempt to shelter profits in salaries. Furthermore, there were no stock dividends or bonuses which would reduce the profit of the Village. In summary, there was no "gain or profit" made by the Village.

The second requisite of the test of whether an institution is a public charity is that the institution must "accomplish ends wholly benevolent." One court has recently defined benevolent as " . . . any act which is prompted by or has for its object the well being of others." *Needville Ind. School District v. S.P.J.S.T. Rest Home*, 566 S.W.2d 40 (Tex.Civ.App.—Beaumont 1978, no writ) citing *State v. Texas Mutual Life Ins. Co.*, 51 S.W.2d 405, 410 (Tex.Civ.App.— Austin 1932), reversed on other grounds, 58 S.W.2d 37 (Tex.Com.App.1933, judgment adopted).

We do not feel the need to define benevolent as such, for an organization should be classified as benevolent by looking to the end results it produces. After examining the "ends" accomplished by this nursing home, this Court finds that the Village is benevolent in character. It provided the residents of the Rio Grande Valley with a place to receive treatment and care at minimal or no expense.

This part of the definition of purely public charity requiring the accomplishment of ends wholly benevolent should also be examined in terms of the final disposition of assets of the Village upon dissolution. One case required that the assets must be pledged in perpetuity to the relief of persons in financial need and to their assistance of obtaining care. *Hilltop Village, Inc. v. Kerrville Indep. School District*, 426 S.W.2d 943 (Tex.Sup.1968). The Supreme Court overruled this strict pledge of assets in the *Good Samaritan* case by permitting a pledge of property and assets to a non-profit fund, foundation or corporation organized and operated exclusively for charitable and religious purposes.

In this case the dissolution provision of the Village as found in the articles of incorporation (Art. 8) was amended in January of 1974. Since we are concerned with the tax status of the Village from 1971 to 1976, the article of dissolution must be examined in both its original and amended form. In this manner we can determine whether the dedication meets the Constitutional and statutory requirements of a purely public charity.

Before the amendment, the assets and property of the Village upon dissolution would become the property of the South-

western District of the Christian and Missionary Alliance. The Christian and Missionary Alliance is, according to one of its officers, a "separate church denomination." There were many churches nation-wide under the control of the Alliance. The Alliance is divided into regional offices, of which the Southwestern District is one. There is testimony that the Southwestern District is a charitable and religious non-profit organization within the State of Texas.

The Supreme Court in overruling the *Hilltop Village* case stated: " . . . the pledge of the property and assets, upon dissolution, to a non-profit fund, foundation or corporation organized and operated exclusively for charitable and religious purposes does meet the Constitutional and statutory requirements of a purely public charity." *City of McAllen v. Ev. Lutheran Good Samaritan Society*, supra at 811; compare *Hilltop Village, Inc. v. Kerrville Indep. School District*, supra. The dissolution of the Village and the reversion of the assets to a corporation organized and operated exclusively for charitable and religious purposes, the Southwestern District, would therefore meet the qualification of dissolution of assets promulgated by the Supreme Court.

According to the certificate of restated articles of incorporation, Article 8 was amended in 1974 to " . . . include certain language which has been held by the Courts to be desirable in corporate charters of non-profit charitable organizations." The amendment stated that the properties and assets of the Village were pledged in perpetuity to the charitable purposes of the organization. The Southwestern District of the Christian and Missionary Alliance no longer was the recipient of those assets but rather the assets were to be distributed to an organization chosen by the Board of Directors which had a similar purpose as the Village. It further required that the recipient organization also be exempt from federal and state taxation on the basis of being a non-profit charitable institution. This amendment clearly fulfills the requirement of pledging assets to a non-profit fund, foundation or corporation organized and operated exclusively for charitable and religious purposes as set out in *Good Samaritan*.

The final part of the test to determine whether an institution qualifies as a public charity is that the institution must " . . . benefit persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the State." The record indicates that the Village took patients of all ages, although most of them were over 65 years of age. Approximately 40 percent of the patients at the Village received care either without payment or with only partial payment. Many of these patients were subject to receiving governmental compensation, which they did not collect because the Village provided them with care. It also appears from the record that no patient was ever denied admission because of inability to pay. Race, color, or religion was not a factor in admissions either.

■ By evaluating the Village, in terms of this three-part definition of purely public charity, it appears that the Alliance Village does qualify for tax exempt status. But a simple fulfillment of the definitional requirements of a public charity is not sufficient to exempt the Village from ad valorem taxation. There is a need to look at the operations of the Village to determine whether the Village does follow its purpose and dedication on a day-to-day basis. This "actual use in fact" test must be undertaken before this Court can determine whether the Village qualifies as a tax exempt public charity. *City of McAllen v. Ev. Lutheran Good Samaritan Society*, supra at 809.

■ One of the most significant areas to examine to determine whether the Village is in fact a public charity is that of its admissions policy. A nursing home must have an open admissions policy which does not discriminate on grounds of race, religion, color or ability to pay. There was no evidence that the Village primarily catered

to missionaries or ministers, even though those groups were specified in the Articles of Incorporation. In fact, no ministers ever received treatment from the Village and only two missionaries received care. See *Air Force Village Found., Inc. v. Northside Ind. Sch. Dist.*, 561 S.W.2d 905 (Tex.Civ. App.—El Paso 1978, writ ref'd n.r.e.). There is no evidence that any persons were discriminated against on account of their race, religion or color. As to discrimination based on ability to pay, there was testimony that 40 percent of the patients were admitted who could not pay all of the costs.

There is some evidence as to a policy of discrimination against Medicare patients. Ostensibly, this was done to eliminate the bookkeeping requirements of complying with the federal bureaucracy. However, there is no evidence that a patient was refused admissions because he was on Medicare. After balancing the evidence implicit in the greater weight and preponderance test, we find no discrimination in the admissions policy of the Village.

Other evidence is present in the record to support the proposition that the Village did operate as a public charity. The Village, by caring for the sick and infirm in that area, assured an obligation or duty which otherwise would have been the responsibility of the community or State. *City of McAllen v. Ev. Lutheran Good Samaritan Society*, supra at 563. The Village provided this care even though it operated at a loss from year-to-year.

The Supreme Court expanded the concept of charity in the *Good Samaritan* case to encompass " . . . the total operation of the institution engaged in humanitarian activities whose services are rendered at cost or less and which are maintained to care for the physical and mental well-being of the recipients." *City of McAllen v. Ev. Lutheran Good Samaritan Society*, supra at 810. After a careful review of the record, it is clear that the total operation of the Alliance Village, Inc., did encompass such humanitarian activities. We therefore hold that the Village did operate as a purely public charity and was entitled to tax exempt status.

We have carefully considered all of the appellant's points of error and they are all overruled.

The judgment of the trial court is affirmed.