**CITY OF McALLEN et al., Appellants,**

**v.**

**The EV. LUTHERAN GOOD SAMARI-TAN SOCIETY, Appellee.**

No. 916.

Court of Civil Appeals of Texas, Corpus Christi.

Jan. 30, 1975.

Rehearing Denied Feb. 13, 1975.

Robert H. Kern, III, Rankin, Kern & Martinez, McAllen, for appellants.

J. Perry Jones, Adams, Graham, Lewis, Jenkins, Jones & Graham, McAllen, Robert C. Londerholm, Eugene T. Hackler, Olathe, Kan., for appellee.

## OPINION

NYE, Chief Justice.

The Ev. Lutheran Good Samaritan Society, a non-profit corporation, engaged in providing nursing home services in McAllen, Texas, brought this suit to enjoin the City of McAllen and the McAllen Independent School District from levying and collecting real and personal property taxes for the year 1972 and thereafter. Plaintiff alleges it is an institution of purely public charity within the meaning of Article 8, § 2 Tex.Const., Vernon's Ann., and Article 7150, § 7, Vernon's Tex. Rev.Civ.Stat.Ann. (1960), making it exempt from property taxation. The case was tried before the court, without the aid of a jury. Judgment was rendered declaring plaintiff's property exempt from taxation. A permanent injunction was issued enjoining the defendants from assessing and levying any future ad valorem taxes on said property so long as plaintiff continues its present policies of operation. No findings of fact or conclusions of law were requested or filed by the trial court. The defendants City of McAllen and McAllen I. S. D. have perfected their appeal.

The Ev. Lutheran Good Samaritan Society, hereinafter referred to as plaintiff or the Society, was organized and incorporated in 1922 in North Dakota as a non-profit and religious corporation. Over the years, the Society has grown to encompass one hundred seventy (170) institutions in twenty-one (21) states of which one hundred sixteen (116) constitute nursing homes.

The Society owns and operates three (3) nursing homes in the State of Texas, all located in the Rio Grande Valley at Harlingen, Brownsville and McAllen, Texas. The McAllen Home makes up the subject matter of the case at bar. The main question on appeal is whether the plaintiff Society is an institution of purely public charity as defined by our Constitution and as interpreted by the courts of this State.

The Society's corporate headquarters are located in Sioux Falls, South Dakota. The management structure is headed by the executive director with eight regional directors under him. Each home has its own administrator who is supervised by one of the regional directors. The policy decisions are made by the Board of Directors consisting of independent businessmen and ministers. The Society has no stockholders nor any capital stock. No dividends of any kind are paid. The Society's Articles of Incorporation provide that it is not organized nor shall it operate for pecuniary gain or profit. It does not contemplate the distribution of gains, profits or dividends to the members thereof. It is organized solely for non-profit purposes. The Articles provide that upon any dissolution or winding up of the corporate affairs and after payment of all debts and liabilities, the Society shall distribute its remaining assets to a non-profit fund, foundation, or corporation which is organized and operated exclusively for charitable and religious purposes and which has established its tax exemption under Section 501(c)(3) of the I.R.C.

The Society's McAllen Home, classified as an "intermediate" nursing home, is authorized under the laws of Texas to do business in this State. It has an authorized capacity of one hundred (100) beds. The home has never been full, but operates around fifty-three per cent (53%) capacity. The majority of the patients need twenty-four hour care and observation. Each patient before being admitted to the home must be under a medical doctor's care. The medical staff at the McAllen Home includes one full time and two part time registered nurses, three L.V.N.'s (Licensed Vocational Nurses), and seventeen (17) nurses aids. Medical and other procedures administered include: blood pressure tests; diabetes tests; physical therapy, together with the services of an occupational therapist; recreational activities; and a full time dietician who supervises meals and special diets required for specific medical problems. The home provides for dispensation of medication from a medicine room under a doctor's orders.

The record reflects that the majority of patients entering plaintiff's homes in Texas are patients who receive or will receive welfare assistance or medicaid. Both the Harlingen and Brownsville homes have from 85 to 90 per cent welfare patients. Although the percentage for the McAllen Home does not appear in the record, plaintiff's exhibit No. 52 reflects that one hundred one (101) out of two hundred fourteen (214) patients admitted between December, 1971, and September, 1973, were welfare recipients. The admission procedure for all the Society's homes appears to be the same. Upon entering the home, a patient must fill out an admission form and either the patient or a responsible party must sign the admission agreement before the patient is accepted. The admission agreement states what the home will provide and what the patient can expect from the home together with an agreement as to how much this person agrees to pay per day or per month.

Two different rates are charged the patients depending on their being classified as private or welfare. The welfare rates, categorized as to the level of care, are skilled $14.79; intermediate 2, $12.87; and intermediate 3, $10.50. These rates are paid by the Welfare Department to the home on a monthly basis. The private or pay patients' rates are likewise classified as to level of care; skilled (1), $17.00; intermediate (2), $15.00; and intermediate (3), $13.00.

As to the financial aspects of the Society, other than income from rates charged, funds are received from donations from various sources. All the Society's homes pay dues to the corporate headquarters amounting to two per cent (2%) of each home's operating income. This money goes to maintain the corporate headquarters, cover all administrative expenses of home office and to pay for costs of all of the forms. This two per cent (2%) money also goes to help those homes that operate at a loss so that they can continue to operate. The balance sheet for the Society overall shows a net income. It appears that when one of the homes is operating at a loss, the corporate headquarters will send to that home sufficient funds to keep it going.

In 1972, the City of McAllen and McAllen I. S. D. assessed and levied ad valorem taxes against the Society in the amount of $8,183.52. The Society brought suit for an injunction against the defendants City of McAllen-McAllen I. S. D., claiming exempt status under Article 8, Sec. 2 of the Texas Constitution and Article 7150. The trial court entered judgment for the Society declaring it exempt from ad valorem taxes assessed and enjoined the defendants from assessing and levying any future ad valorem taxes on the Society's McAllen properties.

Our State Constitution authorized the legislature, by general laws, to exempt from taxation property owned by institutions of purely public charity. Article 8, Section 2, of the Texas Constitution provides in part:

". . . the legislature may, by general laws, exempt from taxation public property used for public purposes . . ."

Article 7150, Section 7, Tex.Rev.Civ.Stat. Ann. (1960), provides:

"The following property shall be exempt from taxation, to-wit:

\*      \*      \*      \*      \*      \*

7. Public Charities.—All buildings and personal property belonging to institutions of purely public charity, together with the lands belonging to and occupied by such institutions, including hospital parking facilities, not leased or otherwise used with a view to profit, unless such rents and profits and all moneys and credits are appropriated by such institutions solely to sustain such institutions and for the benefit of the sick and disabled members and their families and the burial of the same, or for the maintenance of persons when unable to provide for themselves, whether such persons are members of such institutions or not. *An institution of purely public charity under this article is one which dispenses its aid to its members and others in sickness or distress, or at death, without regard to property or riches of the recipient, also when funds, property and assets of such institutions are placed and bound by its law to relieve, aid and administer in any way to the relief of its members* when in want, sickness and distress, and provide homes for its helpless and dependent members and to educate and maintain the orphans of its deceased members or other persons; . . ." (Emphasis added.)

Exemptions from taxation are never favored, and in construing laws exempting any organization, all doubts are resolved against the exemption. Santa Rosa Infirmary v. City of San Antonio, 259 S. W. 926 (Tex.Comm'n App. 1924, judgm. adopted); Morris v. Lone Star Chapter No. 6, Royal Arch Masons, 68 Tex. 698, 5 S.W. 519 (1887); Methodist River Oaks Apartments v. City of Waco, 409 S.W.2d 485 (Tex.Civ.App.—Waco 1966, writ ref'd n. r. e., cert. den., 389 U.S. 848, 88 S.Ct. 75, 19 L.Ed.2d 117). See also River Oaks Garden Club v. City of Houston, 370 S.W. 2d 851 (Tex.Sup.1963).

Whether an organization is a "purely charitable institution" so as to entitle its property to a tax exemption is a

question of fact. The burden of proof is on the organization claiming the exemption to show by facts that it comes clearly within the Constitution and statutory exemptions. Methodist River Oaks Apartments v. City of Waco, supra; Malone-Hogan Hosp. Clinic Found. v. City of Big Spring, 288 S.W.2d 550 (Tex.Civ.App.—Eastland 1956, writ ref'd n. r. e.); Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., 410 S.W. 2d 824 (Tex.Civ.App.—San Antonio 1966, aff. Tex., 426 S.W.2d 943).

Defendants' first and second points of error complain that the trial court erred in its ruling that the Society is an institution of purely public charity as defined by the Constitution of Texas in that the Society failed to prove that it makes no impermissible profit or gain.

■■ An organization is not an "institution of purely public charity" within the constitutional and statutory tax exemption, unless the organization: (1) makes no gain or profit; (2) accomplishes ends wholly benevolent; and (3) benefits persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the state. City of Houston v. Scottish Rite Benev. Ass'n, 111 Tex. 191, 230 S.W. 978 (1921); River Oaks Garden Club v. City of Houston, 370 S.W.2d 851 (Tex.Sup.1963); Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., 426 S.W.2d 943 (Tex.Sup.1968). The record before us shows that the Society as a whole made a profit of $3,012,041.03 in 1971; $3,044,295.-25 in 1972; and $1,537,813.94 in 1973. However, the McAllen home showed an individual loss of $31,924.31 for 1971; $90,454.65 in 1972; and $38,716.01 in 1973. The Supreme Court in Harris v. City of Fort Worth, 142 Tex. 600, 180 S.W.2d 131 (1944) stated that in these tax exempt provisions of the statutes, the words "used with a view to profit", means only that the fund (organization) not be used with a view to *private* gain or profit. See City of Palestine v. Missouri-Pacific Lines Hospi-

tal Ass'n, 99 S.W.2d 311 (Tex.Civ.App.— Amarillo 1936, writ ref'd); City of Dallas v. Smith, 130 Tex. 225, 107 S.W.2d 872 (Tex.Comm'n App., 1937, opinion adopted); City of Houston v. Scottish Rite Benev. Ass'n, supra; Santa Rosa Infirmary v. City of San Antonio, supra, 259 S.W. at page 935. The Court in the Santa Rosa Infirmary case stated:

"While it is stated in City of Houston v. Scottish Rite, etc., supra, that, in order to maintain its status as a purely charitable institution, an organization claiming to be such, and asserting an exemption from taxation, must make no private gain or corporate profit, nothing more was intended than that no private *individual should reap a profit, or where a corporation was the owner that no distributable earnings in the shape of dividends must accrue.*" (Emphasis supplied.)

There is nothing in the record from which it may be inferred that any of the Society's profits are being utilized for any purposes other than those within the scope and purpose of the statutes, nor is there any indication that any of the profit of the Society goes to private gain. The record shows that there is no capital stock in the hands of any person and no dividends are paid to any person, nor is there any distribution of the property of the Society to anyone. Such profit is used for mortgage payments and needed capital improvements and other nursing homes that sustain losses. The excess funds are made available to help out homes in financial trouble, such as the McAllen home. There is no evidence of excessive salaries paid to any of the directors or administrators. The salary of the administrator of the McAllen home is $12,000.00 annually. The record shows such salary, although fair, is not excessive compared with those paid in the nursing home industry generally. There is no evidence that any profits go to private gain or distribution. The defendants' first and second points of error are overruled.

The defendants' third and fourth points of error are that the trial court erred in holding that the Society was an institution of purely public charity as defined by the Constitution of Texas in that the Society failed to prove that it benefited an indefinite number of persons, by extending absolute gratuities, preventing them from becoming burdens to society and to the state. The Society's burden was to satisfy the third requirement of a "Purely Public Charity", such being that it benefited persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the state. See City of Houston v. Scottish Rite Benev. Ass'n, supra; River Oaks Garden Club v. City of Houston, supra; Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., supra.

■ First, the requirement of benefiting persons indefinite in numbers and in personalities, has been satisfied. The record discloses that the policy of the Society was that no one was or could be denied admission and that no one was to be discharged for reason of inability to pay. Such policy is in fact practiced in all of the Society's homes and according to the Executive Director, it is his job to see that such policy is carried out. The evidence shows that although pay is received from most patients either directly or indirectly (from welfare), no person unable to pay is refused admission, nor is any person asked to leave if they later become unable or refuse to pay. A corporate resolution appears in the record and provides in part:

"Be it resolved that the minutes of The Ev. Lutheran Good Samaritan Society reflect the policy and practice of the Society since its inception in 1922, that no person who applies for treatment or care is denied admission or once admitted is discharged because of poverty or riches, creed, station or color. All residents are accepted without the imposition of such conditions as to unreasonably amount to a denial of the facilities of the Society to objects of Charity."

It is clear to us that there is sufficient evidence to satisfy the requirement of benefiting persons, indefinite in numbers and in personalities.

■ The second requirement of which the Society had the burden of proof was that they have assumed to some extent that which otherwise might become the obligation or duty of the community or the state. We think the Society has done so. The decisions in other states recognizing tax exemptions are rested principally upon the conclusion that people in later years have special care and residential requirements, the alleviation of which is of social value; and that the exemption should be allowed where such needs are being met by institutions not organized or operated for private profit. Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., supra. The record before us shows that the McAllen home is an intermediate nursing home. The majority of the patients require twenty-four hour care and observation. Each patient admitted is under a doctor's care. Numerous minor medical procedures are carried out at the nursing home which would otherwise have had to be carried out at some hospital or other medical facility if such nursing home as operated by the Society were not in existence.

The decisions in other states which have denied exemptions have emphasized that the occupants of the homes were the principal beneficiaries rather than society in general, and that society was not relieved of responsibility for persons in need. Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., supra. This is clearly not the case here.

The Supreme Court in City of Houston v. Scottish Rite Benev. Ass'n, 111 Tex. 191, 230 S.W. 978 (1921), said:

"In our opinion, the Legislature might reasonably conclude that an institution was one of 'purely public charity' where: First, it made no gain or profit; second, it accomplished ends wholly benevolent;

and, third, *it benefited persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity from becoming burdens to society and to the state.*" (Emphasis added.)

The evidence shows that these essential conditions prevail in the McAllen Home. In the Santa Rosa Infirmary case, supra, the court said:

"But yet, if it may be said, within the purview of the Constitution to be a purely public charity, is it such an institution within the legislative definition thereof? A consideration of the legislative provision develops that at least two concurrent situations must exist: (1) The dispensation of its charities both to its members and others in sickness, distress, and death must be without regard to poverty or riches of the recipient; and (2) its property and assets must be placed and bound by its laws to relieve, aid, and administer in any way to the relief of its members when in want, sickness, and distress, and provide homes for its helpless and dependent members."

See also City of Waco v. Texas Retired Teacher Res. Corp., 464 S.W.2d 346 (Tex. Sup.1971).

▪ The first requisite of the Santa Rosa Infirmary case is clearly satisfied in that the Society's policies, evidenced by testimony and corporate resolution, are that no one is to be denied admission nor can anyone be discharged for reason of inability to pay.

▪ As to the second requisite, it also appears to be satisfied. The Society's Articles of Incorporation provide that upon dissolution or winding up of the corporation after payment of all debts and liabilities, the Society shall distribute its assets remaining to a non-profit fund, foundation, or corporation which is organized and operated exclusively for charitable and religious purposes and which has established its tax exemption under Section 501(c)(3)

of the I.R.C. The second requirement then, that its property and assets must be placed and bound by its laws to relieve, aid and administer in any way to the relief of its members has been satisfied. See Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., supra.

▪ The theory generally then, upon which institutions of this character are exempted from taxation, is that they must pledge their properties and assets in perpetuity to the relief of persons in financial need and serve the government by relieving it to some extent of that which would otherwise be a public duty or governmental function to care for the indigent, sick and afflicted. It is the assumption by such institution of this burden which compensates the government for the exemption granted them from the general obligation resting upon all citizens to pay taxes. Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., supra; Santa Rosa Infirmary v. City of San Antonio, supra.

The record shows that the McAllen facility has suffered losses in 1971, 1972, and in 1973. The McAllen Home has made no profit since its inception. Although the home charges certain rates depending on whether the patient is a pay patient or welfare patient, the money received from the pay patients and welfare department does not completely cover the cost expended by the home for the patient's care and observation. The evidence shows that while some of the Society's homes made a profit, many operate at a loss. Out of this profit, funds are sent to homes which are operating at a loss so they may continue to function. Mr. August Hoeger, the Society's executive director, specifically testified that for the year 1974, he had to send $83,400.00 to the McAllen Home to keep it going. Without outside help from the Society's Headquarters or elsewhere, the McAllen Home would be unable to continue to operate and care for the indigent, sick and afflicted. Except for this subsist-

ence, this operation would then become a public duty or governmental function to care for that category of persons who could not pay the full costs of their care. To this extent, the Society has assumed that which would otherwise be a public duty or governmental function to care for the indigent, sick and afflicted.

The defendants contend that Challenge Homes, Inc. v. County of Lubbock, 474 S. W.2d 746 (Tex.Civ.App.—Eastland 1971, writ ref'd n. r. e.) is controlling. This case is distinguishable from the case at bar in that the jury in that case found: (1) that the funds, property and assets of Challenge Homes, Inc. *were not placed* and bound in perpetuity by its by-laws to relieve, aid and administer to those in want, sickness and distress; (2) that Challenge Homes *did not dispense* such aid to those in want or distress without regard to their poverty or sickness; (3) that the ends accomplished by Challenge Homes, Inc. in its operations are not wholly benevolent; (4) that Challenge Homes, Inc. in its operations *does not benefit persons*, indefinite in number and personality, by preventing them, through absolute gratuity from becoming burdens to society; (5) that Challenge Homes, Inc. reserves the right to consider and act upon any applications for admittance by one who lacks both private and welfare sources of care.

Any one of the above standing alone would, we think, have been sufficient to preclude Challenge Homes, Inc. from attaining exempt status. In the case at bar, the complete opposite exists. Although no findings of fact or conclusions of law were filed, the evidence was sufficient to uphold the implied findings of the trial court; that the Society made no impermissible profit or gain; it accomplished ends wholly benevolent; and it benefited persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the state.

It is this assumption by the Society in McAllen, Texas, of this burden which compensates the local governing agencies for the exemption granted it from the general obligation resting upon all citizens to pay taxes. The local McAllen Nursing Home has made no profit. It overcomes its deficit by receipts from the Society. If at any time in the future the Society, through its McAllen Home, fails to relieve the community or the state of the care and expense of those in need to prevent them from becoming a burden upon the community, then the plaintiffs will no longer qualify for exemption from ad valorem taxes.

■ Defendants' fifth point of error is that the trial court erred in ruling that the Society was an institution of purely public charity as defined by the Constitution of Texas in that the Society failed to prove that it is bound by its laws to admission of applicants without regard to their poverty. The evidence clearly shows that admissions were made without regard to wealth or poverty. The record is replete with testimony stating the policy of the Society to be that no one was to be denied admission due to poverty or wealth, race, color or creed and that once admitted no one was to be discharged because of his or her inability to pay. The defendants cite Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., supra, as authority for their contentions. That case was distinguishable on this point from the case at bar in that the Supreme Court held that Hilltop's policy of admissions was a matter of negotiation and mutual agreement and because each case was considered on its own merits, it constituted an impermissible obstacle to admission. In Hilltop, they were not accepting residents without regard to their financial circumstances. Certain set rates are charged in this case, however; if a patient is unable to pay initially, he or she is not denied admission. If they later became unable to pay, they are not discharged. There are no negotiations for admission depending on one's station in life. Next, the defendants

complain that the Society failed to prove that its requirement that a responsible party sign the admission agreement was not an obstacle in the way of admission of the charity patients. The requirement of having a responsible party sign the admission agreement is self-evident. Since the home furnishes a place for those who have no one to care for them, it is necessary that a "responsible party" be named in the event of death, accident or for payment. The naming of a "responsible party" as such does not constitute an impermissible obstacle to admission of charity patients with respect to the admission agreement. Such information requested is necessary in order to properly care for and administer to the needs of the patients. See Santa Rosa Infirmary v. City of San Antonio, supra, 259 S.W. at page 930.

Defendants next complain that the Society failed to prove that its minimum fee requirement was not an obstacle in the way of admission of charity patients. With this, we also disagree. Defendants rely on City of Waco v. Texas Retired Teacher Res. Corp., 464 S.W.2d 346 (Tex.Sup. 1971). This case is easily distinguishable from the case at bar in that no one was accepted in the Waco case during the years in question without regard to poverty or riches and no one was accepted in the residence who could not pay a minimum fee of $115.00 per month, and only then if the payment was supplemented by an additional $25.00. Such is not the situation in the case at bar. Although certain set rates were charged, there is no evidence that anyone was denied admission or discharged because of his or her inability to pay. The evidence is to the contrary. The facts show that some patients were admitted to the nursing home who were unable to pay at all.

We have carefully considered all of the defendants' points of error and they are overruled. The judgment of the trial court is affirmed.