The CITY OF McALLEN et al., Petitioners,

v.

The EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY, Respondent.

No. B–5186.

Supreme Court of Texas.

Nov. 12, 1975.

Rehearing Denied Jan. 14, 1976.

Rankin, Kern, Martinez & Jones, Inc., Rob Kern and H. H. Rankin, Jr., McAllen, for petitioners.

Adams, Graham, Lewis, Jenkins, Jones & Graham, J. Perry Jones, McAllen, Hackler, Londerholm, Speer, Vader & Austin, Robert C. Londerholm and Eugene T. Hackler, Olathe, Kan., for respondent.

DENTON, Justice.

The Evangelical Lutheran Good Samaritan Society brought this suit to enjoin the City of McAllen and the McAllen Independent School District from levying and collecting ad valorem taxes on an intermediate nursing home owned and operated by the Society in McAllen. The trial court issued the injunction prayed for upon concluding that the Society's operation of the facility met the requisites of a purely public charity and therefore was exempt from taxation under the terms of Article 8, Section 2 of the Texas Constitution and Article 7150, Section 7 of Vernon's Texas Civil Statutes. The court of civil appeals affirmed, holding that profits realized were used for permissible purposes, that no one was denied admission to nor discharged from the nursing home because of inability to pay, and that the Society assumed a burden that would otherwise be an obligation of the community or the state. 518 S.W.2d 557. We affirm the judgments of the courts below.

The Evangelical Lutheran Good Samaritan Society is a non-profit corporation operating a facility which provides intermediate nursing home services in McAllen, Texas. Additionally, the Society presently operates some 170 institutions in 21 states, with 116 of the institutions serving as nursing homes such as the one located in McAllen. The management structure of the Society is composed of an executive director, an associate director and eight regional directors who supervise the administrators of each individual facility, as well as a board of directors, made up of independent businessmen and ministers, that makes policy decisions for the Society.

Because of the status of the nursing home as an intermediate care facility, patients admitted must be under the care of a physician. The services rendered are analogous to those rendered by hospitals in that they provide the same care that hospitals furnish to patients convalescing from surgery or being treated for illness not requiring surgery. The services are limited to a large extent to the aged and infirmed.

Daily rates charged to those admitted are based on the level of care that the patient requires as well as a determination of whether the patient is classified as a private or welfare patient. Welfare patients of the Society's McAllen home are charged a lesser rate than are those patients who are able to pay the full cost of their services. More than one-half of the patients at the McAllen facility are welfare patients. For each welfare recipient, the home received less than the average daily cost of care for each welfare recipient. The remaining portion of the cost of their treatment for which they are unable to pay is absorbed by the Society. However, often the situation is presented where a patient has a private source of funds which entitles him to only supplemental welfare payments. These supplemental payments do not entirely cover the cost of providing care and if the patient chooses not to pay the remainder out of his own funds, the nursing home must make up the difference. Approximately 10 percent of the patients at the McAllen home fall into this category of requiring the nursing home itself to undertake part of the burden of paying for their health care needs. There are no patients in the McAllen home who completely fail to contribute toward the payment of their medical care. Because not all patients accepted pay the cost of their care, and to insure that the operation of the nursing home pays for itself, the rates of private patients have been periodically adjusted upwards. The McAllen home, however, continues to operate at a substantial loss, showing a loss of $90,400 in 1972 and $39,000 in 1973.

■■■ This court has uniformly applied the definition of an institution of purely public charity as set out in *City of Houston v. Scottish Rite Benevolent Association*, 111 Tex. 191, 198–99, 230 S.W. 978, 981 (1921) which is to the effect that:

[T]he Legislature might reasonably conclude that an institution was one of "purely public charity" where: First, it

made no gain or profit, second, it accomplished ends wholly benevolent; and, third, it benefited persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the state.

The City of McAllen and McAllen Independent School District contend first that the Society has placed itself outside of the above definition in that the Society's overall operations have generated profits. The testimony instead reflects that profits realized are used for mortgage payments, debt service, capital improvements and other activities directed at sustaining and furthering the Society's benevolent activities. As mentioned earlier, there is no capital stock, no dividends have ever been paid to anyone, nor has there been any distribution of property owned by the Society to anyone. The law is well settled that the proscription against an institution's realization of "gain or profit" refers to gain or profit by private individuals or the accrual of distributable profits. *Harris v. City of Fort Worth,* 142 Tex. 600, 180 S.W.2d 131 (1944); *City of Dallas v. Smith,* 130 Tex. 225, 107 S.W.2d 872 (1937); *Santa Rosa Infirmary v. City of San Antonio,* 259 S.W. 926 (Tex.Comm'n App.1924, jdgmt adopted). Therefore, the fact that the net result of the Society's endeavors was the acquisition of profit, would not subject the organization to taxation because the profits were used for the permissible purposes of maintaining or expanding the Society's operations. *City of Dallas v. Smith, supra; Santa Rosa Infirmary v. City of San Antonio, supra.*

The contention is also made that the Society has failed to meet the requisites of a purely public charity in that it was not shown that the Society's services benefited an indefinite number of persons through the extension of absolute gratuities, thereby relieving a burden that might otherwise be placed upon the community and the state. The record discloses that patients admitted to the nursing home who are able to do so are required to pay for the services

rendered; and, in some cases the families or relatives of the patients make such payments. In the case of indigent patients who do not have families who can or will contribute, payments are generally made by the State Welfare Department. The Society however, has established a policy to the effect that "no person who applies for treatment or care is denied admission or once admitted is discharged because of poverty or riches, creed, station or color."

■ The question is whether the Society has, with its dedication of the McAllen home to charitable purposes, accompanied this by actual use in fact of the property for such purposes; because a mere charter declaration of a worthwhile purpose will not make an institution one of purely public charity if it is not one in fact. *The City of Waco v. Texas Retired Teacher Residence Corporation,* 464 S.W.2d 346, 348 (Tex. 1971); *Hilltop Village, Inc. v. Kerrville Independent School District,* 426 S.W.2d 943, 947 (Tex.1968); *River Oaks Garden Club v. City of Houston,* 370 S.W.2d 851, 856 (Tex. 1963). The above-cited open admissions policy appears to be one actively administered by the Society. Evidence presented at the trial reflected that although some compensation is received from all patients, either directly from paying patients or indirectly through welfare assistance, some 10 percent of the patients at the McAllen facility fail to pay the cost of their care. The evidence in the record that no one has ever been denied admission nor discharged because of inability to pay is uncontradicted.

■ In this context, the petitioners also point to the requirement that a purely public charity dispense "absolute" gratuities, and argue that the policy of requiring those who can pay to do so and the making of supplemental payments by the Society for those who cannot pay all of their costs does not meet the test. The term "absolute" should not be so construed. Rather, a more reasonable application of the term would require that gratuities which are ex-

tended be of an unconditional nature. Furthermore, it is well settled that the fact that paying patients predominate over those unable to pay does not detract from the charitable nature of the service rendered. *Santa Rosa Infirmary v. City of San Antonio, supra* ; *see* Annot., 37 A.L.R.3d 1191 (1971). Reliance upon percentages of paying patients versus non-paying patients, however, should not be the controlling factor. With the advent of present day social security and welfare programs, the traditional concept of charity, involving the extension of free services to the poor and alms-giving, will be rarely found since wide ranging assistance is available to the poor under such programs. Furthermore, the courts have defined charity to be something more than mere alms-giving or the relief of poverty and distress. *See, e. g., San Antonio Conservation Society, Inc. v. City of San Antonio*, 455 S.W.2d 743 (Tex.1970); *Fredericka Home for the Aged v. San Diego County*, 35 Cal.2d 789, 221 P.2d 68 (1950). The ultimate consideration then, should be based upon an evaluation of the total operation of the institution engaged in humanitarian activities whose services are rendered at cost or less and which are maintained to care for the physical and mental well-being of the recipients. By that total operation the institution must assume, "to a material extent, that which otherwise might become the obligation or duty of the community or the state". *River Oaks Garden Club v. City of Houston*, 370 S.W.2d 851, 854 (Tex.1963); *City of Houston v. Scottish Rite Benevolent Association*, 111 Tex. 191, 230 S.W. 978 (1921).

Although the petitioners do not directly attack the Society's Charter declaration relative to the dedication of its properties as not being in compliance with this Court's holding in *Hilltop Village, Inc. v. Kerrville Independent School District, supra*, we think the Charter declaration and pledge by the Society here is at variance with the requisites set out in *Hilltop Village, Inc.* There it was held the institution, in order to meet the requirements of the Constitution

and statutes for exemption from taxation, must pledge its property and assets in perpetuity to the relief of persons in financial need and to the assistance in obtaining care.

 Here the Society's Articles of Incorporation provide that the Society is not organized, nor shall it operate for pecuniary gain or profit, but rather that it shall engage in the ownership, operation and management of institutions such as the nursing home involved here as well as other benevolent work of a charitable and religious nature in order to promote the general health of the community. There is no capital stock, no stockholders, and no dividends of any kind that are paid, and the Articles further provide that upon dissolution and after payment of all debts, the Society shall distribute its remaining assets to a nonprofit fund, foundation or corporation which is organized and operated exclusively for charitable and religious purposes. It has often been held that a charitable institution is entitled to exemption of only that property which is used by the institution exclusively for purely public charity. By this it is meant that if the institution rents the premises to someone who does not qualify for the charitable exemption, though the revenue is used entirely by the institution in its work of pure charity, the premises are not exempt from taxation. *Morris v. Masons,* 68 Tex. 698, 703, 5 S.W. 519 (1887). Further, the owner may not permit its property to be used by organizations which exist for purposes which are not charitable. *City of Houston v. Scottish Rite Benevolent Association, supra.* It does not follow that every use of the property must be gratuitous. There may be hospital patients, for example, who fully compensate the institution for all services received, but the character of the institution and the charitable nature of the use of the property is not nullified. *Santa Rosa Infirmary v. City of San Antonio,* 259 S.W. 926 (Tex.Comm'n App.1924 jdgmt adopted). Nor does it follow that all religious or other benevolent activities must be excluded in the operation of the hospital or home. It is no fatal

defect to join charitable and religious purposes; the exemption will not be withdrawn so long as the charitable requirements are met. We hold the Society's dedication of the McAllen home to charitable purposes and the pledge of the property and assets, upon dissolution, to a non-profit fund, foundation or corporation organized and operated exclusively for charitable and religious purposes does meet the Constitutional and statutory requirements of a purely public charity. To the extent that our writing in *Hilltop Village* is inconsistent with what is said here, the former opinion is overruled.

█ One final contention raised by the City and the School District concerns the contention that the Society's admissions procedure constitutes an impermissible obstacle to the admission of charity patients. The contention is that the respondent's admission policies and practices are at least as objectionable as those of *Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist.*, 426 S.W.2d 943 (Tex.1968). We do not agree. In *Hilltop* the admission policy was stated in its bylaws to be a matter of negotiation and mutual agreement and each case being considered on its own merit. In contrast, the Society here has established the policy that "no person who applies for treatment or care is denied admission or once admitted is discharged because of poverty or riches, creed, station or color." In holding *Hilltop Village Inc.* did not meet the requirements of the Constitution and Statutes of Texas for exemption from taxation as an institution of purely public charity, the court concluded " . . . it is apparent that Hilltop Village is not accepting residents without regard to their financial circumstances nor is it bound to assume charitable obligations or to engage in dispensing relief to those in need."

In the second trial of *Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist.*, 487 S.W.2d 167 (Tex.Civ.App. writ ref'd n. r. e.), the trial court again held the institution was not one of purely public charity. The institution's charter and bylaws were amended to comply with this Court's previous holding, and the Home's administrator testified that no applicant had been turned down for lack of funds, but no one had been admitted exclusively on charity. The court of civil appeals held, however, that the evidence supported the implied finding of the trial court that Hilltop Village was not, in fact, accepting residents without regard to their financial circumstances.

In the present case the Society requires each prospective patient to obtain the signature of a "responsible party" as part of the admission agreement. The evidence reflected that this procedure was utilized not only for payment purposes but also for notification in the event of accident or death of the patient. Inasmuch as this would seem to comport with proper administrative procedures and the evidence was clearly to the effect that the inability to pay for one's health care was never any obstacle to admission (as seen by the high ratio of welfare patients in the Society's facilities in Texas), we conclude that the requirement of naming a "responsible party" does not constitute an impermissible obstacle to the admission of charity patients. As was stated in the *Santa Rosa* case in dealing with a similar procedure:

> With respect to the admission of charity patients no obstacle appears to have been placed in the way of their reception other than a requirement that statements of the applicants, or other trustworthy persons, be furnished at the time of their admission, to fairly indicate that they were objects of charity and unable to pay for the services rendered them, and, while no claim was made that sick or afflicted were sought out to be made the recipients of charity, it does appear that the infirmary was available and open to those who applied for free treatment.

We hold that the Society's McAllen facility has met the requisites of a purely public charity and is therefore exempt from taxation. Accordingly, the judgments of the

trial court and the court of civil appeals are affirmed.

Dissenting opinion by STEAKLEY, J., in which McGEE and JOHNSON, JJ., join.

STEAKLEY, Justice (dissenting).

I am unsure of the rule the Court has now established governing the exemption from taxation of charitable institutions, and of what has been done to our established precedents.

It was emphasized in *Santa Rose Infirmary v. City of San Antonio,* 259 S.W. 926 (Tex.Comm'n. App.1924, jdgmt adopted) that the assets of the charitable corporations there were "appropriately bound by both corporate charters *to the exclusive* purposes of their general charitable declarations and intentions."

We said in *River Oaks Garden Club v. City of Houston,* 370 S.W.2d 851 (Tex.1963), that an organization is not an institution of purely public charity within the meaning of the constitutional exemption, "unless its funds, property and assets are pledged and used to provide for the basic needs of the sick, distressed and needy."

We said in *Hilltop Village, Inc. v. Kerrville Independent School District,* 426 S.W.2d 943 (Tex.1968), that to qualify for the exemption, "the institution must be one whose properties and assets are pledged in perpetuity to the relief of persons in financial need."

Here, as the Court recognizes, the Articles of Incorporation of the Society stipulate that its properties are to be owned, operated and managed in the accomplishment of "benevolent work of a charitable *and religious nature*", and, further, that upon dissolution, the assets of the corporation shall be distributed "to a non-profit fund, foundation or corporation which is organized and operated exclusively for charitable *and religious purposes.*" It is thus apparent that the Society is not bound to the exclusive use of its properties for charitable purposes, i. e., the relief of those

in want, sickness and distress, or those in financial need. Charity and religion are not the same when considered in the context of tax exemption under the Constitution and statutes of our State; and the use of properties for charitable *and* religious purposes is not the use of such properties *exclusively for* charitable purposes as heretofore required for tax exemption under the rationale of *Santa Rosa, River Oaks and Hilltop Village.* Overruling the latter where "inconsistent", as the Court is now saying, leaves untouched the former decisions to the same effect, together with a profusion of questions unanswered. To illustrate: the Court now says "Nor does it follow that all religious or other benevolent activities must be excluded in the operation of the hospital or home." Are we now saying that an institution may be part charity and part religious, or part something else, and yet be an institution of *purely public charity* as required by the Constitution for tax exemption; and that such an institution is nonetheless bound *exclusively* to charity? Or, that it no longer must be? *Santa Rosa, supra,* and cited in the opinion of the Court, recognizes that "the Constitution requires the property, as a prerequisite to its right to exemption, to be exclusively used by the charitable institution . . ." How can this be so if the property is used in part for religious or other benevolent activities? Are we now saying, further, that the properties and assets of an institution may be pledged at times to the relief of persons in need, and at such times the institution is tax exempt; whereas, later, and perhaps off and on, the pledge may be altered and the exemption lost? Must institutions claiming the tax exemption be annually examined by the taxing authorities to determine if its policies, or the current tax exemption pledge of its funds, property and assets, have either or both been changed since the last taxing date?

We said in *City of Houston v. Scottish Rite Benev. Ass'n.,* 111 Tex. 191, 230 S.W. 978 (1921), that a requisite to charitable exemption is that the institution benefit

"persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the State."

We said in *River Oaks Garden Club,* that the institution must assume "to a material extent, that which otherwise might become the obligation or duty of the community or the state."

We said in *Hilltop Village,* that the properties and assets of the institution must be pledged in perpetuity to the relief of persons in financial need in obtaining the care they must have to prevent their becoming a burden on society.

The Court speaks here of the Society having established *a policy* to the effect that "no person who applies for treatment or care is denied admission or once admitted is discharged because of poverty or riches, creed, station or color." The establishment of *a policy* is far different from being appropriately bound to the relief of a burden on society, the only fair, reciprocal and accepted basis for tax exemption in the first place. See *Santa Rosa, supra.* The Court cites no showing here whereunder the Society is precluded from modifying its current policy so as to utilize its funds and properties for a combination of charitable and religious purposes, or, indeed, for charitable purposes that may not relieve a burden that otherwise would be that of the community or of the State.

I would hold that the Society has not established its right to tax exemption under our precedents.

McGEE and JOHNSON, JJ., join in this dissent.