Michael Massengale, Justice, dissenting.
Our original panel opinion-issued over a year ago-was correct. At this stage of proceedings, neither party has established conclusively that it should prevail as a matter of law.
To be clear, the withdrawn panel opinion did not say, and I do not now suggest, that NCR can't claim the charitable exemption. Rather, the record before us does not establish conclusively NCR's entitlement to the exemption as a matter of law. There are genuine issues of material fact still to be resolved.
The relevant statute specifies that a tax exemption is available to a charitable organization that provides permanent housing for persons who are 62 years of age or older "without regard to the residents' ability to pay." TEX. TAX CODE § 11.18(d)(13). The evidence showed that NCR required payment of rent and a security deposit. It also showed that NCR had an eviction policy that could apply to a resident who failed to pay rent.
It is conceivable that evidence could show that, through the availability of various forms of assistance, the rent and security-deposit requirements did not have the effect of actually excluding any applicant or resident. But NCR's summary-judgment evidence did not prove that.
It somewhat less obvious what evidence could demonstrate conclusively that a policy authorizing eviction for failure to pay rent could never result in the eviction of a resident for failure to pay rent. In any case, the summary-judgment evidence presented by NCR did not conclusively establish that this policy would never be enforced. Instead, the evidence suggested only that the policy was not actually enforced during the relevant tax years, and NCR has a separate corporate policy that it won't actually evict residents for failure to pay if that can be avoided. On this record, NCR's maintenance of a policy that expressly authorized eviction for failure to pay at least created a fact issue as to the applicability of the tax exemption premised on providing housing "without regard to the residents' ability to pay."
The attached appendix reproduces the portion of our previous opinion which further explained why NCR's motion for summary judgment was correctly denied.
*478 Because the panel majority now has concluded otherwise, I respectfully dissent.
Appendix
National Church Residences of Alief, TX v. Harris County Appraisal District , No. 01-15-00900-CV, 2016 WL 4199148, *8-*11 (Tex. App.-Houston [1st Dist.] Aug. 9, 2016, no pet. h.).
* * *
C. Analysis: NCR's Motion for Summary Judgment
Next, we determine whether NCR met its summary-judgment burden to establish that it was entitled to its tax-exemption claim for tax years 2012 and 2013. To meet this burden, NCR had to conclusively establish that it provided housing and related services to its residents without regard to the residents' ability to pay for those services.
In its motion for summary judgment, NCR asserted that the phrase "without regard to the beneficiaries' ability to pay" does not preclude all consideration of a beneficiary's ability to pay; rather, it means that an organization seeking a tax exemption cannot "discriminate" against those who are not able to pay.[1] To support its assertion, NCR relied on City of McAllen v. Evangelical Lutheran Good Samaritan Society , 530 S.W.2d 806 (Tex. 1975). There, the Supreme Court of Texas determined that a non-profit organization, Evangelical Lutheran Good Samaritan Society ("the Society"), was entitled to a property-tax exemption as a "purely public charity" under now-repealed Section 7 of Texas Revised Civil Statute article 7150. Id. at 808. Section 7 required that, to be a purely public charity, an organization had to provide its benefits "without regard to poverty or riches of the recipient."[2] See N. Alamo Water Supply , 804 S.W.2d at 897 (discussing content and previous court interpretations of article 7150 ).
In its analysis, the City of McAllen court found it noteworthy that the Society had "established a policy to the effect that 'no person who applies for treatment or care is denied admission or once admitted is discharged because of poverty or riches, creed, station or color.' " City of McAllen , 530 S.W.2d at 809 (emphasis added). The court explained, however, that "a mere charter declaration of a worthwhile purpose will not make an institution one of purely public charity if it is not one in fact." Id. In other words, the Society needed to show that it was actually putting its stated policy into practice. See id. Relevant to this determination, the City of McAllen court noted that "[e]vidence presented at *479 the trial reflected that although some compensation is received from all patients, either directly from paying patients or indirectly through welfare assistance, some 10 percent of the patients at the [ ] facility fail to pay the cost of their care." Id. In other words, the Society, as a charity, bore the cost of the services it provided for 10 percent of its residents. Based on the evidence that the Society provided services to those for which it never received any form of payment, the court determined that the Society had put its policy into practice because "[t]he evidence in the record that no one has ever been denied admission nor discharged because of inability to pay is uncontradicted." Id. ; see also The Leaves , 742 S.W.2d at 430 (upholding trial court's determination that owner of nursing home was entitled to exemption under Section 11.18(d) when evidence showed, inter alia, that facility did not "turn away patients who cannot pay").
NCR asserts that the evidence it offered to support summary judgment in this case is analogous to that offered to support the tax exemption in City of McAllen . We disagree. The type of evidence offered in City of McAllen is not present in the instant summary-judgment record.
In City of McAllen , the evidence established that, although 10 percent of the nursing home residents never paid for the services provided to them, the Society nonetheless provided services to those non-paying residents. See City of McAllen , 530 S.W.2d at 809. Here, although Van Camp testified that no resident was evicted for nonpayment of rent, that testimony was significant only if a resident had actually failed to pay rent. Unlike in City of McAllen , NCR did not show that any resident had failed to pay rent and had nonetheless been permitted to remain at the Property during the subject tax years.[3] Thus, even if we were to accept NCR's general assertion that the phrase "without regard to the beneficiaries ability to pay" means simply that an organization seeking a tax exemption cannot discriminate against those unable to pay, NCR did not establish its entitlement to summary judgment because it did not show that any resident was unable to pay the rent; that is, NCR did not show that it provided housing to a resident even though the resident did not pay, as was shown in City of McAllen.
As another basis for summary judgment, NCR asserts that an analysis of its "total operations" show that it provided housing and related services to its residents without regard to their ability to pay. To support its "total operations" argument, NCR relies on the following language from NHH-Canal Street Apartments :
We hold the "ultimate consideration" should turn on the totality of the services NHH-Canal Street provided at or below cost, or in the case of programs and services, at no cost.... The City of McAllen court's rationale is instructive and controls the outcome here. Key to that holding is not that services were provided free of charge or that certain patients contributed toward the cost of their care and certain patients paid little or nothing. See *480 City of McAllen , 530 S.W.2d at 809-10. Rather, the "ultimate consideration" is based on an evaluation of the total operation and whether the charitable organization demonstrated that beneficiaries were not required to pay the full cost of services received. Id.
NHH-Canal St. Apts. , 2015 WL 7306541, at *4.
In NHH-Canal Street Apartments , the evidence had shown that NHH-Canal Street provided housing and "other support, including assistance with securing employment, managing finances, education assistance, social programs, nutritional information, health screenings and counseling" to its residents. Id. at *1. With regard to its operations, the evidence had shown as follows:
The rent levels are substantially below-market rental rates due to large contributions which eliminated debt for the construction and operation of the apartments. The rents do not fund all of the resident services provided at NHH-Canal. As a result, NHH-Canal operates at a loss on an annual basis. Additionally, because the rents do not cover the total cost of operating expenses (rent and other services provided), New Hope Housing [NHH-Canal's parent company] subsidizes the operations at NHH-Canal Street. Finally, the evidence reflects that NHH-Canal Street was constructed entirely through charitable contributions, rendering the operation debt-free. When taken as a whole (below-market rent, costs of resident services programs and debt-free construction), for the tax years at issue, 65-75% of NHH-Canal Street's costs are charitable.
Id. at *3. After evaluating NHH-Canal's total operations, the court held "the evidence conclusively established that NHH-Canal Street is a charitable organization which engages exclusively in serving the 'impoverished' without regard to their ability to pay, and it should not be denied the tax exemption of Section 11.18(d)(2)." Id. at *4.
Here, NCR argues that an evaluation of its total operations shows that it serves its residents without regard to their ability to pay because its residents do not pay the full cost of the housing or supportive services provided. NCR emphasizes that all of its residents pay less than market rent; instead, each resident pays the non-subsidized portion of the market rent as determined by a HUD formula.
The evidence showed that market rent for NCR's apartments is $389. Based on the HUD formula, some tenants paid as little as $13 per month with most residents paying between $100 and $200 per month. HUD paid NCR the difference between what the tenant paid and the market rent of $389. In other words, between the resident's payment and HUD's payment, NCR received the full monthly market rent of $389, unless a resident failed to pay. Here, NCR points to no evidence that, during tax years 2012 and 2013, it was not receiving the full $389 market rent each month for each apartment; that is, it points to no evidence that its residents were not paying their portion of the market rent. To the contrary, the list offered by NCR-showing what each resident paid in monthly rent and what HUD paid for each apartment-indicated that NCR was paid the market rent of $389 for its apartments as of October 12, 2012.
Additionally, in NHH-Canal Street Apartments the evidence showed that, considering its total operations, NHH-Canal Street did not receive sufficient funds from its residents to cover the cost of the housing provided; rather, 65-75% of NHH-Canal Street's costs were paid for by its parent company or through charitable contributions to the organization. See *481 id. at *4 ; see also City of McAllen , 530 S.W.2d at 808 (recognizing as significant evidence that the Society did not receive sufficient funds from its residents, including the resident's welfare payments, to cover all costs of services provided); Dall. Cnty. Appraisal Dist. , 742 S.W.2d at 427 (granting exemption when 14%, or $135,000, of facility's revenue was derived from charitable contributions to cover shortfall of payments made by residents). Here, in contrast, the evidence did not establish that NCR covered any portion of the cost of providing services to its residents for tax years 2012 and 2013 with charitable funds rather than with funds derived from rental payments received either directly from individual residents or from HUD subsidies. We recognize that NCR offered financial and auditing records for the Property in support of its motion for summary judgment; however, the records are less than clear with respect to the issue of its total operations, and NCR offered no assistance in interpreting the records for purposes of this analysis.
We further note that NCR offered affidavit evidence indicating that it "provides its tenants with an allowance to assist in meeting their electric utility obligations." However, NCR offered no evidence regarding whether it provided such assistance specifically during tax years 2012 and 2013 or regarding any of the particulars of any allowances that it had given.
NCR also offered evidence indicating that various medical, social, and educational services were available, without charge, to its residents. However, in contrast to the evidence in NHH-Canal Street Apartments , there was no evidence here establishing that the cost of these services was borne by NCR during the relevant tax years. See NHH-Canal St. Apts. , 2015 WL 7306541, at *4. In fact, it appears that a number of the services listed by NCR were part of the federally-funded service coordination program available at the Property.
In short, after considering the totality of NCR's operations, the evidence was not sufficient to show, as it had in NHH-Canal Street Apartments , what portion, if any, of the costs of the housing or the supportive services were charitable. Thus, the evidence regarding the totality of NCR's operations failed to conclusively show as a matter of law that NCR provided permanent housing or other support to its residents without regard to the residents' ability to pay.
We conclude that NCR did not conclusively establish its right to a property tax exemption under Tax Code section 11.18(d). We hold that the trial court did not err when it denied NCR's motion for summary judgment.
We sustain NCR's sole issue to the extent that it challenged the trial court's granting of HCAD's motion for summary judgment, but we overrule NCR's issue to the extent that it asserts the trial court erred by denying its own motion for summary judgment.
Conclusion
We reverse the judgment of the trial court and remand for further proceedings.
/s/ Laura Carter Higley
Justice
Panel consists of Justices Higley, Bland, and Massengale.

In its motion for summary judgment, NCR also asserted that its consideration of its residents' ability to pay should not preclude it from receiving a tax exemption to that extent that HUD regulations require it to consider a prospective resident's ability to pay. However, Tax Code Sections 11.18(d)(3) and (13) make no exceptions for a charitable organization to receive a tax exemption on the basis that the organization must consider the beneficiaries' ability to pay in order to comply with governmental regulations. NCR's "interpretation would have us judicially amend the statute to add an exception not implicitly contained in the language of the statute." Fitzgerald v. Advanced Spine Fixation Sys., Inc. , 996 S.W.2d 864, 867 (Tex. 1999). We note that "[w]e may add words into a statutory provision only when necessary to give effect to clear legislative intent. Only truly extraordinary circumstances showing unmistakable legislative intent should divert us from enforcing the statute as written." Id. NCR has not shown such legislative intent here.

Section 7 of Texas Revised Civil Statute article 7150 has been recognized as a predecessor statute to Tax Code Section 11.18(d). See N. Alamo Water Supply Corp. v. Willacy Cty. Appraisal Dist. , 804 S.W.2d 894, 897 (Tex. 1991).

At oral argument, NCR pointed out that the resident list, dated October 12, 2012, indicated that a number of residents had negative account balances, ranging from a negative balance of $1.00 to $37.00. However, no other evidence was offered to explain the origin of the negative balances; nor was it apparent how long each negative balance had been pending. In other words, it is not clear whether the negative balances corresponded to a failure to pay rent or to some other fee or charge.